No. 24-1912

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

DERRICK JONES, *et al.*,

*Plaintiffs-Appellees,*

v.

CITY OF ST. LOUIS, MISSOURI, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Hon. Henry Edward Autrey
No. 4:21-cv-00600-HEA

## PLAINTIFFS-APPELLEES' RESPONSE BRIEF

Maureen Hanlon
ARCHCITY DEFENDERS
440 N. 4th Street, Suite 390
St. Louis, MO 63102
314-814-9455
mhanlon@archcitydefenders.org

Lauren E. Bartlett
ST. LOUIS UNIVERSITY LEGAL
CLINICS
100 N. Tucker Blvd., Suite 704
St. Louis, Missouri 63101
314-977-3306
lauren.bartlett@slu.edu

Shubra Ohri
Amy Briehan
RODERICK & SOLANGE
    MACARTHUR JUSTICE CENTER
906 Olive Street, Suite 420
St. Louis, Missouri 63101
314-254-8540
shubra.ohri@macarthurjustice.org

*Counsel for Plaintiffs-Appellees Derrick Jones, Jerome Jones, Darnell Rusan,
and Marrell Withers*

# RULE 28A(I)(1) SUMMARY AND REQUEST FOR ARGUMENT

This appeal concerns important questions about the constitutional right to be free from the infliction of excessive chemical agents on restrained or passively resisting pretrial detainees. It also concerns the proper scope of an interlocutory appeal. As such, it would benefit from the presentation of oral argument. Plaintiffs-Appellees respectfully request 15 minutes of argument per side.

# TABLE OF CONTENTS

RULE 28A(i)(1) SUMMARY AND REQUEST FOR ARGUMENT ..........i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES.....................................................iv

JURISDICTIONAL STATEMENT .........................................1

INTRODUCTION ....................................................................1

STATEMENT OF ISSUES........................................................3

STATEMENT OF THE CASE ...................................................4

I.   Factual Background ........................................................4

   A.   Officers inflict chemical agents on detainees—including those restrained—for asking questions, making noise, and declining to immediately follow directives. ........................................4

   B.   COs routinely shut off the water to cells without justification or documentation. ...............................10

   C.   All four plaintiffs were pepper sprayed and deprived of water. ...13

     1.   Marrell Withers. ........................................................13

     2.   Jerome Jones........................................................15

     3.   Darnell Rusan. .......................................................17

     4.   Derrick Jones. ........................................................20

II.  Procedural History .......................................................22

STANDARD OF REVIEW.......................................................23

SUMMARY OF THE ARGUMENT .......................................23

ARGUMENT............................................................................26

I.   Defendant Officers are not entitled to qualified immunity. ............26

   A.   The district court conducted its qualified immunity analysis at the correct level of generality..............................27

   B.   The district court properly determined that the Defendant Officers violated clearly established constitutional rights.........................30

     1.   Defendants apply the wrong legal standard. .............................30

2. Using large amounts of chemical agents on passive, non-violent detainees violates clearly established law..................................32

3. Each use of force violated clearly established rights. ...............36

II. The City's *Monell* appeals fail.................................................55

A. This Court lacks pendent appellate jurisdiction over the *Monell* appeals. .............................................................................55

1. There is no jurisdiction over the excessive force Monell appeal.
..........................................................................................55

2. There is no jurisdiction over the water shut-off Monell appeal.58

B. The district court correctly denied summary judgment on the excessive-force *Monell* claim. .........................................................58

1. Officers routinely use excessive chemical agents on passively resisting or restrained detainees. ..............................................59

2. The City was deliberately indifferent to the widespread overuse of chemical agents..........................................................63

3. The excessive-force custom caused the violations of Plaintiffs' constitutional rights. ..............................................................66

C. The district court correctly denied summary judgment on the water shut-off *Monell* claim. .........................................................68

1. There is an unconstitutional pattern of punitive water shut-offs.
..........................................................................................68

2. The City was deliberately indifferent to the pattern of punitive water shut-offs. ..................................................................70

3. The water shut-off custom caused the deprivation of Plaintiffs' constitutional rights. ..............................................................72

III. The City's ADA appeal fails. .........................................................72

A. This Court lacks jurisdiction over the ADA appeal. .....................72

B. The district court properly denied summary judgment on the ADA claim..................................................................................73

CONCLUSION ...................................................................................77

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Waddle,*
No. 4:06CV919 HEA, 2008 WL 4561467 (E.D. Mo. Oct. 10, 2008) ............................................................................. 28

*Armstrong v. Newsom,*
484 F. Supp. 3d 808 (N.D. Cal. 2020)................................. 75

*Atencio v. Arpaio,*
674 F. App'x 623 (9th Cir. 2016) ........................................ 35

*Bahl v. County of Ramsey,*
695 F.3d 778 (8th Cir. 2012)........................................... 4, 74

*Baribeau v. City of Minneapolis,*
596 F.3d 465 (8th Cir. 2010)............................................... 73

*Beck v. City of Pittsburgh,*
89 F.3d 966 (3d Cir. 1996) ........................................... 61, 65

*Behrens v. Pelletier,*
516 U.S. 299 (1996) ............................................................ 29

*Burns v. Eaton,*
752 F.3d 1136 (8th Cir. 2014)....................................... 34, 44

*Chavarriaga v. New Jersey Department of Corrections,*
806 F.3d 210 (3d Cir. 2015) .......................................... 4, 70

*Chay-Velasquez v. Ashcroft,*
367 F.3d 751 (8th Cir. 2004)........................... 63, 67, 72, 74

*City & Cnty. of San Francisco v. Sheehan,*
575 U.S. 600 (2015) ............................................................ 76

*Dean v. Jones,*
984 F.3d 295 (4th Cir. 2021) ............................................................ 46

*Thelma D. ex rel. Dolores A. v. Bd. of Educ.,*
934 F.2d 929 (8th Cir. 1991) ....................................................... 63, 64

*Edwards v. Byrd,*
750 F.3d 728 (8th Cir. 2014) ............................................................ 39

*Ellison v. Lesher,*
796 F.3d 910 (8th Cir. 2015) ............................................................ 36

*Gatlin ex rel. Est. of Gatlin v. Green,*
362 F.3d 1089 (8th Cir. 2004) .......................................................... 63

*Est. of Moreland v. Dieter,*
395 F.3d 747 (7th Cir. 2005) ............................................................ 35

*Est. of Richards v. Remington,*
No. CV-22-00429-TUC-JGZ, 2023 WL 2503724 (D. Ariz.
Mar. 14, 2023) ................................................................................. 75

*Fisherman v. Launderville,*
100 F.4th 978 (8th Cir. 2024) ............................................... 46, 51, 54

*Foulk v. Charrier,*
262 F.3d 687 (8th Cir. 2001) ....................................................... 34, 41

*Glover v. Paul,*
78 F.4th 1019 (8th Cir. 2023) ..................................................... 31, 32

*Gorman v. Bartch,*
152 F.3d 907 (8th Cir. 1998) ............................................................ 74

*Grandstaff v. City of Borger,*
767 F.2d 161 (5th Cir. 1985) ....................................................... 66, 71

*Greene v. Feaster,*
733 F. App'x 80 (4th Cir. 2018) ...................................................... 35

*Hall v. Higgins,*
77 F.4th 1171 (8th Cir. 2023) .......................................................... 77

*Hampton v. City of St. Louis,*
   2022 WL 2643507 (E.D. Mo. July 8, 2022) ......................................50

*Harris v. City of Pagedale,*
   821 F.2d 499 (8th Cir. 1987).......................................... *passim*

*Heartland Acad. Cmty. Church v. Waddle,*
   595 F.3d 798 (8th Cir. 2010)..................................27, 28, 29

*Heuton v. Ford Motor Co.,*
   930 F.3d 1015 (8th Cir. 2019) ......................................76

*Hickey v. Reeder,*
   12 F.3d 754 (8th Cir. 1993)..........................................32, 51

*Holscher v. Mille Lacs Cnty.,*
   924 F. Supp. 2d 1044 (D. Minn. 2013) ......................................59

*Hughes v. Rodriguez,*
   31 F.4th 1211 (9th Cir. 2022) ......................................46

*Jacoby v. Mack,*
   755 F. App'x 888 (11th Cir. 2018) ......................................36

*Jones v. McNeese,*
   675 F.3d 1158 (8th Cir. 2012)......................................30

*Jones v. Shields,*
   207 F.3d 491 (8th Cir. 2000)......................................48

*Kingsley v. Hendrickson,*
   576 U.S. 389 (2015).......................................... *passim*

*Laney v. City of St. Louis,*
   56 F.4th 1153 (8th Cir. 2023) ......................................52

*Langford v. Norris,*
   614 F.3d 445 (8th Cir. 2010)......................................73

*Lawrence v. Bowersox,*
   297 F.3d 727 (8th Cir. 2002).......................................... *passim*

*S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs,*
    725 F.3d 843 (8th Cir. 2013) .................................................................. 56

*Manning v. Cotton,*
    862 F.3d 663 (8th Cir. 2017) .................................................... 3, 25, 55

*Marks v. Bauer,*
    107 F.4th 840 (8th Cir. 2024) ............................................................... 38

*Meagley v. City of Little Rock,*
    639 F.3d 384 (8th Cir. 2011) ........................................................... 4, 76

*Melendez v. Sec'y, Fla. Dep't of Corr.,*
    No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022) ......... 64, 70

*Milligan v. City of Red Oak, Iowa,*
    230 F.3d 355 (8th Cir. 2000) .................................................. 26, 46, 51

*Mitchell v. Kirchmeier,*
    28 F.4th 888 (8th Cir. 2022) .................................................... 3, 59, 62

*Moore v. City of Ferguson,*
    213 F. Supp. 3d 1138 (E.D. Mo. 2016) .......................................... 59, 60

*Moore v. LaSalle Mgmt. Co.,*
    41 F.4th 493 (5th Cir. 2022) ......................................................... 59, 67

*Padilla v. Beard,*
    No. 2:14-CV-1118 KJM-CKD, 2017 WL 1253874 (E.D. Cal. Jan. 27, 2017) .............................................................................. 76

*Parrish v. Luckie,*
    963 F.2d 201 (8th Cir. 1992) .............................................. 3, 62, 64, 71

*Partridge v. Smith,*
    No. 17-cv-02941-CMA-STV, 2020 WL 897653 (D. Colo. Feb. 25, 2020) ................................................................................. 4, 75

*Peebles v. Potter,*
    354 F.3d 761 (8th Cir. 2004) .......................................................... 4, 75

*Poemoceah v. Morton Cnty., N. Dakota,*
   117 F.4th 1049 (8th Cir. 2024) ........................................ 26

*Quraishi v. St. Charles Cnty., Missouri,*
   986 F.3d 831 (8th Cir. 2021) ............................................ 35

*Riis v. Shaver,*
   458 F. Supp. 3d 1130 (D.S.D. 2020) ................................ 59

*Robbins v. Becker,*
   715 F.3d 691 (8th Cir. 2013) ............................................ 29

*S.M. v. Krigbaum,*
   808 F.3d 335 (8th Cir. 2015) ............................................ 39

*Segrain v. Duffy,*
   118 F.4th 45 (1st Cir. 2024) ............................................. 35

*Setchfield v. St. Charles Cnty.,*
   109 F.4th 1084 (8th Cir. 2024) ........................................ 42

*Shannon v. Koehler,*
   616 F.3d 855 (8th Cir. 2010) ........................... 3, 55, 57, 72

*A.K.B. ex rel. Silva v. Indep. Sch. Dist. 194,*
   No. 19-CV-2421, 2020 WL 1470971 (D. Minn. Mar. 26,
   2020) ................................................................................ 76

*Smith v. City of Des Moines,*
   99 F.3d 1466 (8th Cir. 1996) ............................................ 39

*Smith v. Conway Cnty.,*
   759 F.3d 853 (8th Cir. 2014) ............................................ 55

*Soto v. Dickey,*
   744 F.2d 1260 (7th Cir. 1984) ..................................... 53, 54

*Speer v. City of Wynne,*
   276 F.3d 980 (8th Cir. 2002) ................................... 3, 57, 58

*Spires v. Paul,*
   581 F. App'x 786 (11th Cir. 2014) ................................... 70

*Stearns v. Inmate Services Corporation*,
  957 F.3d 902 (8th Cir. 2020) .......................................................... 4, 69

*Sterling v. Bd. of Trustees of the Univ. of Arkansas*,
  42 F.4th 901 (8th Cir. 2022) ............................................................... 23

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020) .......................................................... 39

*Tatum v. Robinson*,
  858 F.3d 544 (8th Cir. 2017) ............................................................... 39

*Taylor v. St. Louis Cmty. Coll.*,
  2 F.4th 1124 (8th Cir. 2021) .................................................. 47, 48, 54

*Thomas v. City of St. Louis*,
  No. 4-18-CV-01566, 2021 WL 4622502 (E.D. Mo. Oct. 7,
  2021) ............................................................................................................ 51

*Thompson v. Murray*,
  800 F.3d 979 (8th Cir. 2015) ....................................................... 29, 37

*Thurmond v. Andrews*,
  972 F.3d 1007 (8th Cir. 2020) ........................................................... 56

*Treats v. Morgan*,
  308 F.3d 868 (8th Cir. 2002) ..................................................... *passim*

*Veneklase v. City of Fargo*,
  78 F.3d 1264 (8th Cir. 1996) .............................................................. 56

*Walker v. Bowersox*,
  526 F.3d 1186 (8th Cir. 2008) ........................................ 3, 33, 34, 44

*Walton v. Dawson*,
  752 F.3d 1109 (8th Cir. 2014) ............................................... 27, 29, 30

*Ware v. Jackson County*,
  150 F.3d 873 (8th Cir. 1998) ...................................................... *passim*

*Watkins v. City of St. Louis, Missouri*,
  102 F.4th 947 (8th Cir. 2024) ............................................................ 35

*Webb v. City of Maplewood,*
   889 F.3d 483 (8th Cir. 2018)......................................................... 3, 57

*Wilson v. City of Southlake,*
   936 F.3d 326 (5th Cir. 2019).............................................................. 74

*Withers v. Johnson,*
   763 F.3d 998 (8th Cir. 2014).............................................................. 75

## Statutes

42 U.S.C. § 1983....................................................................................... 22

42 U.S.C. § 12102(1)(A) ........................................................................ 74

42 U.S.C. § 12132................................................................................... 73

## JURISDICTIONAL STATEMENT

Plaintiffs sued under 42 U.S.C. § 1983 in the U.S. District Court for the Eastern District of Missouri. The district court had jurisdiction under 28 U.S.C. § 1331. The district court denied defendants qualified immunity on March 31, 2024, R.Doc.383; App.6079, and defendants timely appealed on April 30, 2024, R.Doc.384; App.6093. This Court has limited jurisdiction over the qualified immunity appeals under 28 U.S.C. § 1292. It lacks jurisdiction over the remaining appeals. *See infra* Sections II.A, III.A.

## INTRODUCTION

For years, officers at the St. Louis City Justice Center jail ("CJC") have unleashed chemical agents against detainees—often while they were restrained, isolated in cells, or suffering medical crises—without justification or oversight. The misuse of chemical agents is not only custom, but reflexive: officers respond to disruptions and actions as innocuous as asking a question with violent measures designed for crowd control. These routine attacks are frequently compounded by prolonged water shut-offs that make it impossible for detainees to wash the chemical agents off their bodies—or to even access drinking water.

1

Pursuant to these customs, officers were emboldened to brutalize the four Plaintiffs in this case. The district court thus correctly denied qualified immunity to the individual officers and summary judgment to the City.

In this interlocutory appeal challenging the qualified immunity denials, Defendants present sanitized versions of their misconduct and apply a legal standard that has been squarely rejected by the Supreme Court. Under the correct standard, substantial evidence shows that each officer violated clearly established law by using excessive force on the plaintiffs—all of whom were restrained or passively non-compliant when defendants inflicted chemical agents. After affirming the denials of qualified immunity to each officer, this Court's inquiry should stop.

Should this Court decide, however, to accept the City's strained arguments to exercise pendent appellate jurisdiction over the remaining claims, it should affirm. As for the *Monell* claims, substantial evidence demonstrates that jail leadership is deliberately indifferent to the systemic and widespread patterns of unconstitutional force and water deprivations that caused Plaintiffs harm. The evidence further shows that the City violated the Americans with Disabilities Act by failing to

make reasonable accommodations in its uses of force on detainees with qualifying disabilities.

## STATEMENT OF ISSUES

I.     Whether the district court, after detailing each use of force, properly denied each Defendant Officer qualified immunity based on clearly established law that prohibits pepper spraying pretrial detainees who are restrained, engaged in passive non-compliance, or both.

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *Lawrence v. Bowersox*, 297 F.3d 727 (8th Cir. 2002); *Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002); *Walker v. Bowersox*, 526 F.3d 1186 (8th Cir. 2008)

II.    Whether this Court lacks pendent appellate jurisdiction over the *Monell* and American with Disabilities Act claims where they are not "inextricably intertwined" with the qualified immunity issues properly on appeal.

*Shannon v. Koehler*, 616 F.3d 855 (8th Cir. 2010); *Manning v. Cotton*, 862 F.3d 663 (8th Cir. 2017); *Webb v. City of Maplewood*, 889 F.3d 483 (8th Cir. 2018); *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002)

III.   Whether the district court properly denied summary judgment on the excessive-force *Monell* claim where CJC had an unconstitutional custom comprised of hundreds of similar incidents, CJC leadership took no remedial action despite reviewing reports detailing these incidents, and the custom caused the plaintiffs' harms.

*Ware v. Jackson County*, 150 F.3d 873 (8th Cir. 1998); *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022); *Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992); *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987)

IV.    Whether the district court properly denied summary judgment on the water shut-off *Monell* claim where CJC shut off water "all the time," CJC leadership failed to act despite being notified, and the custom caused the plaintiffs' harms.

*Ware v. Jackson County*, 150 F.3d 873 (8th Cir. 1998); *Stearns v. Inmate Services Corporation*, 957 F.3d 902 (8th Cir. 2020); *Chavarriaga v. New Jersey Department of Corrections*, 806 F.3d 210 (3d Cir. 2015); *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987)

V.    Whether the district court properly denied summary judgment on the ADA claim where two plaintiffs had qualifying disabilities and CJC failed to provide reasonable accommodations in its uses of force despite being informed of those disabilities.

*Bahl v. County of Ramsey*, 695 F.3d 778 (8th Cir. 2012); *Peebles v. Potter*, 354 F.3d 761 (8th Cir. 2004); *Partridge v. Smith*, No. 17-cv-02941-CMA-STV, 2020 WL 897653 (D. Colo. Feb. 25, 2020); *Meagley v. City of Little Rock*, 639 F.3d 384 (8th Cir. 2011)

## STATEMENT OF THE CASE

## I.    Factual Background

### A.    Officers inflict chemical agents on detainees— including those restrained—for asking questions, making noise, and declining to immediately follow directives.

Chemical agents cause "respiratory distress," "chemical burns," and "permanent vision changes."[1] R.Doc.344-40 at 2; App.1096. They can

---

[1] Plaintiffs use the terms chemical agents, pepper spray, OC spray, and mace interchangeably.

cause even more "severe injuries" when large amounts are used in confined spaces and when victims cannot properly decontaminate themselves. R.Doc.344-40 at 2-3; App.1096-97. Despite these dangers, chemical agents are routinely overused at CJC. Indeed, "[m]ultiple CJC officials" expressed concern that corrections officers "resort too quickly to the use of pepper spray, before employing non-violent tactics." R.Doc.345-33 at 6; App.1527.

CJC policies authorize chemical agents only when "all other" options "have been exhausted." R.Doc.316-17 at 4; App.168. The use-of-force policy specifies that officers should use "the least amount of force necessary to overcome resistance" and mandates that all force "stop once staff regains control." *Id*. And the use-of-chemical-agents policy states that chemical agents should not be used on those who are "passive[ly] resistant" or merely "disruptive" unless authorized by a supervisor and "justified in writing." R.Doc.131-1 at 4; Supp.App.291; *see also* R.Doc.316-17 at 4; App.168 (authorizing spontaneous force only for "active resistance beyond mere non-compliance with verbal command"). It also prohibits the use of chemical agents on people in restraints. R.Doc.131-1 at 4; Supp.App.291.

Officers openly defy these policies. Defendant Richard said "it doesn't matter to me what it says on that piece of paper [the policy]." R.Doc.342-2 at 9; App.392. Defendant Alexander said the policy was "not reality." R.Doc.345-15 at 6; App.1444. Both explained that officers could, and did, use chemical agents on people who were "just banging on their cells," R.Doc.345-15 at 7; App.1445, or engaging in no more than "verbal resistance," R.Doc.342-2 at 11; App.394.

The City produced 1,241 use-of-force reports concerning chemical agent use at CJC from a five-year period. R.Doc.345-14 at 2; App.1437; R.Doc.311 at 4-5; Supp.App.303-04. Expert Schriro explained that in her considerable experience, that is a "large" number for a correctional facility, and, the "actual number is appreciably greater" because "a considerable number of months of data" are "missing altogether." R.Doc.343-8 at 40; App.634. Detainees corroborate this widespread overuse of chemical agents: Marrell Withers saw "hundreds" of people sprayed, R.Doc.342-5 at 15; App.455, Derrick Jones saw officers use chemical agents "more than 40" times, R.Doc.342-1 at 17; App.366, and Jerome Jones noted that Defendant Fowlkes specifically was "always

macing people," R.Doc.316-20 at 2; App.176. As one detainee explained, the officers "kill us" with pepper spray. R.Doc.345-33 at 20; App.1541.

From 2018–2022, there were at least 50 instances of officers using chemical agents on detainees who were handcuffed, locked in their cells, or otherwise restrained.[2] There were more than 25 instances of officers spraying detainees for complaining, asking for information, or making repeated requests.[3] There were more than 250 instances of officers inflicting chemical agents on passively resisting detainees.[4] There were at least 80 instances of officers spraying people on suicide watch for

---

[2] R.Doc.344-14 at 2; App.887; R.Doc.344-15; App.889 (video); R.Doc.344-16; App.890 (video); R.Doc.344-17 through R.Doc.344-23; App.892-970 (7 incidents); R.Doc.344-24; App.971 (video); R.Doc.344-25; App.972 (video); R.Doc.344-26; App.973 (video); R.Doc.344-27 at 1-16; App.974-989; R.Doc.344-29 through R.Doc.344-34; App.995-1046 (6 incidents); R.Doc.346-1 at 36; App.1660; R.Doc.346-41 at 1-95; App.4679-4773 (8 incidents); R.Doc.346-42 at 1-50; App.4774-4823 (9 incidents); R.Doc.346-43 at 1-57; App.4824-4880 (9 incidents); R.Doc.346-44 at 1-127; App.4881-5007 (12 incidents).

[3] R.Doc.346-1; App.1625-1701 (7 incidents); R.Doc.346-2; App.1702-1760 (6 incidents); R.Doc.346-3; App.1761-1771 (7 incidents); R.Doc.72-3; Supp.App.41-51; R.Doc.72-8; Supp.App.76-85; R.Doc.72-13; Supp.App.103-109; R.Doc.72-20; Supp.App.145-150; R.Doc.72-24; Supp.App.166-169; R.Doc.72-28; Supp.App.185-189; R.Doc.72-30; Supp.App.197-203; R.Doc.72-31; Supp.App.204-209; R.Doc.72-38; Supp.App.240-245.

[4] R.Doc.346-4 through R.Doc.346-33; App.1772-4200.

"infractions" like failing to wear a suicide gown.[5] And in more than 60 cases, officers deployed chemical agents meant for crowd control on individuals.[6] Each of these incidents demonstrates the routine overuse of chemical agents.

This overuse extended to those with serious mental health issues. For example, in one case, officers repeatedly sprayed a detainee on suicide watch through the "food pass" of his cell because he was making noise and would not return his food tray. R.Doc.344-37 at 6; App.1074. Another detainee was sprayed during a mental health crisis as he crouched naked in the corner of his cell. R.Doc.345-6 at 1; App.1153.

Chemical agents are also used on other vulnerable people. Defendant Jones recounted "[a] couple of times" when a supervisor asked him to spray "special needs people." R.Doc.342-6 at 5; App.462. And Derrick Jones saw officers use chemical agents on a detainee while he "was on the ground shaking" from a seizure. R.Doc.342-1 at 17; App.366.

In some cases, officers use chemical agents on those who cannot harm others. One person was sprayed while he was "cuffed and shackled"

---

[5] R.Doc.346-34 through R.Doc.346-40; App.4201-4678.

[6] R.Doc.346-45 through R.Doc.346-53; App.5008-5799.

in a restraint chair, R.Doc.345-9 at 2; App.1425, and another was sprayed while his hands were cuffed behind him, R.Doc.344-12; App.881. In yet another case, a report explicitly states that the detainee "was already handcuffed prior to this Use of Force." R.Doc.346-1 at 36; App.1660.

And sometimes chemical agents are inflicted for minor transgressions like failing to "pack [] belongings," R.Doc.346-10 at 28; App.2428, asking for cell accommodations, R.Doc.346-10 at 57; App.2457, and failing to move from one cell to another, R.Doc.346-10 at 67; App.2467.

CJC leadership—from captain to commissioner—reviewed and signed off on these use-of-force reports showing that chemical agents were being used on people who asked questions, passively resisted commands, or were restrained. R.Doc.343-7 at 4; App.585. Commissioner Clemons-Abdullah further confirmed that she reviewed "questionable" use-of-force reports and was ultimately responsible for ensuring CJC practices operated according to policy. R.Doc.343-22 at 4-5; App.774-75.

As set out in an external investigation of jail practices, "[m]ultiple CJC officials expressed concern that corrections officers tend to resort too quickly to the use of pepper spray." R.Doc.345-33 at 6; App.1527. CJC

officials were likewise aware that some "officers were not truthful when documenting the reasons for the use of pepper spray." *Id*. Superintendent Hayes himself pointed to a "lack of accountability" with respect to chemical agents. R.Doc.345-40 at 11; App.1612. He explained that officers "go from 0 to 100 really quick" and are more likely to use force than other de-escalation tactics. R.Doc.345-40 at 3; App.1604.

## B. COs routinely shut off the water to cells without justification or documentation.

CJC officers can—and do—turn off the water to cells and leave detainees without water in their sinks and toilets. R.Doc.316-19 at 2; App.173. Officers turn off the water "as punishment" to an entire unit when a few people misbehave by "not locking down" or "kicking [a] door." R.Doc.343-8 at 21-22; App.615-16. Sometimes detainees are "never given a reason why the water [i]s off." *Id.* Once the water is turned off, it can remain off "for days." *Id*.

When the water to cells is shut off, CJC has no written policy requiring the provision of water, R.Doc.343-8 at 17; App.611, and officers generally offer only "baby cup[s]" of water to detainees at mealtimes, R.Doc.343-3 at 8; App.554. Officers exercise complete discretion and detainees are forced to wait until officers decide to "turn the water back

on." R.Doc.344-13 at 4; App.885. Until then, detainees have effectively "no water to drink." R.Doc.343-8 at 20; App.614. Nor do detainees have water to "brush their teeth, flush the toilet, or shower." *Id.* Unable to flush, people are "stuck in the cell with feces." R.Doc.343-8 at 21; App.615.

Officers also use chemical agents and water shut-offs in conjunction. R.Doc.343-8 at 22; App.616. One person described how he was "not allowed to shower" after being maced because the water was turned off. *Id.* Other times, people were sprayed because they asked for the water to be turned back on. *See, e.g.*, R.Doc.343-29 at 2; App.830 ("I get mace for asking why is our water off."). When officers use pepper spray and turn the water off, people are left in their cells "burning" for days. R.Doc.343-3 at 6-7; App.552-53.

The City's corporate representative, Mr. Roth, acknowledged that "there are no written provisions to ensure inmates have access to potable water" nor are there written policies asking officers "to document when, why, and for how long" the water is off. R.Doc.343-8 at 17; App.611. As a result, officers shut the water off "all the time." R.Doc.342-5 at 16;

App.456. When this happens, detainees "beg for water" until officers are "ready" to turn it on again. *Id*.

Defendant Borders acknowledged that he turned water off "a couple times." R.Doc.344-13 at 4; App.885. And many detainees explained how Defendant Fowlkes would "cut the water so many times for no reason." R.Doc.337-1 at 221; Sealed.App.221; *see also, e.g.*, R.Doc.337-4 at 98; Sealed.App.882 (explaining Fowlkes "keep[s] turning off our water"); R.Doc.343-6 at 3; App.579 (explaining Fowlkes turned off water "for the entire length of his shift").

Detainees repeatedly informed leadership about the water shut-offs by submitting grievances and requests for services. R.Doc.342-1 at 15; App.364 (Derrick Jones filed 3-4 grievances); R.Doc.342-4 at 29; App.439 (Darnell Rusan). One request states, "I am in a room with no water and have been in this room for a week." R.Doc.345-19 at 2; App.1478. Another explained the detainee was in a room with "no running water" and had to "yell and scream to use the toilet." R.Doc.345-21 at 2; App.1482.

Indeed, news of the water shut-offs was directly communicated to Commissioner Glass by the Public Defender's Office. R.Doc.343-23 at 6; App.783. He "didn't personally" investigate and, though he said he asked

jail staff to "verify" the issue he could not recall who he asked. *Id*. His successor, Commissioner Clemons-Abdullah, likewise admitted that she was aware of water shut-off allegations. R.Doc.343-22 at 7; App.777.

## C. All four plaintiffs were pepper sprayed and deprived of water.

### 1. *Marrell Withers.*

Marrell Withers had tested negative for COVID-19 after a five-day lockdown period when officers tried to relocate him to a COVID-positive area of the jail during the Omicron surge. R.Doc.342-5 at 6; App.446. Marrell declined to enter the COVID-19 isolation unit, later explaining that at that point, "nobody know what COVID is" except that "it's killing people." R.Doc.342-5 at 10; App.450. So, he asked Defendants Jones and Wills to call medical and confirm his negative status. R.Doc.342-5 at 9; App.449. They refused. R.Doc.342-5 at 7; App.447. As Defendant Wills put it, he "wasn't trying to hear what [Marrell] was saying." R.Doc.342-8 at 9; App.479.

Marrell was so desperate to avoid the COVID-positive area that he asked if he could go to solitary confinement instead. R.Doc.342-5 at 7; App.447. The officers ignored him and handcuffed him. R.Doc.342-5 at 9-10; App.449-50. In a last-ditch effort, Marrell said he was going to "break

the computer" because he believed that would get him "sent to [s]egregation." R.Doc.342-5 at 11; App.451. However, Marrell had no intention of breaking the computer, nor could he—his arms were handcuffed behind his back, and he was incapable of reaching it. *Id.* Video footage confirms this. R.Doc.342-7; App.470. And both Defendants Jones and Wills acknowledged that Marrell did not present a threat to person or property. R.Doc.342-6 at 9-10; App.466-67; R.Doc.342-8 at 7; App.477.

Nevertheless, Defendant Wills directed Defendant Jones to pepper spray Marrell. R.Doc.342-6 at 9; App.466. Marrell told them he had asthma. R.Doc.342-6 at 12; App.469. As video footage shows, Defendant Jones pepper sprayed him in the face anyway. R.Doc.342-7 at 8:41-8:50; App.470. Marrell turned around to face the wall and repeated that he had asthma. R.Doc.342-6 at 10; App.467. Defendant Jones sprayed him again from "about a foot" away. R.Doc.342-7 at 9:00-9:10; App.470, R.Doc.342-6 at 10; App.467.

Afterwards, the officers did not provide Marrell with a change of clothes or the opportunity to shower; he was only permitted to wash his eyes. R.Doc.342-5 at 13; App.453. "It burned for a couple days" and he

had trouble breathing. *Id*. The attack had a lasting impact: "I get nervous when guards have Mace around me . . . I still fear being assaulted." R.Doc.342-5 at 14; App.454.

Major Tonya Harry reviewed this use-of-force incident and determined that use of chemical agents "does not appear to be justifiable." R.Doc.316-18 at 1; App.171. Harry testified that Marrell was just "standing there" and "trying to give an explanation as to why he didn't want to go into the unit." R.Doc.342-10 at 7; App.503. Yet neither Defendant Wills nor Defendant Jones was disciplined. R.Doc.342-6 at 11-12; App.468-69, R.Doc.342-8 at 8; App.478.

Marrell also had his water shut off multiple times at CJC. R.Doc.342-5 at 16-17; App.456-57. At one point, he was housed in a cell without water for seven to eight days. R.Doc.342-5 at 15; App.455.

### 2. *Jerome Jones.*

During the two years Jerome Jones was detained at CJC before his acquittal, officers repeatedly relocated him to new cells. R.Doc.316-20 at 2; App.176. So, when officers demanded that Jerome move yet again, he asked why. R.Doc.343-3 at 5-6; App.551-52. Instead of explaining, Defendant Fowlkes handcuffed Jerome and took him to a visitor's booth.

R.Doc.343-3 at 5; App.551. Defendant Fowlkes then sprayed a large can of pepper spray into the booth—less than one foot from Jerome's face—and locked him in. R.Doc.343-3 at 6, 11; App.552, 557. Although Jerome immediately agreed to comply with the order to move cells, Defendant Fowlkes left him in the booth for 30 minutes. R.Doc.343-3 at 6; App.552.

As Jerome tried to get someone to let him out, Defendant Fowlkes said, "he feel it" and told officers to "[l]eave him in there." *Id*. The spray filled the room and Jerome could not see or breathe. Doc.343-3 at 11; App.557. He got down to the ground "to suck some air from under the door." Doc.343-3 at 6; App.552. His "whole face" was "burning," and he thought he "was gonna die." Doc.343-3 at 11; App.557.

After 30 minutes, officers removed him from the booth. R.Doc.343-3 at 6; App.552. Although he asked to see the nurse and take a shower, they took him straight to a new cell without water. R.Doc.343-3 at 6-7; App.552-53. The "water was off for a couple weeks" so Jerome stayed in his cell "burning." R.Doc.343-3 at 7; App.553. It was only after Jerome called his mother, who contacted his lawyer, that the officers allowed him to see the nurse and shower. *Id*.

Soon after he was pepper sprayed, Jerome was acquitted at trial. R.Doc.343-3 at 9; App.555. But he continued to have "problem[s] with breathing" and anxiety. *Id*. For months after returning home, he would "wake up out of [his] sleep gasping for air." *Id*.

### 3. *Darnell Rusan.*

**First use of force.** Darnell suffers from seizures. R.Doc.342-4 at 4; App.414. So, when he arrived at CJC, he informed officials that he needed his seizure medication. R.Doc.337-1 at 262; Sealed.App.262. But they did not give it to him, and he had a seizure in the holding tank. R.Doc. 342-4 at 7; App.417. After weeks of trying to access his medication, he used his recreational time to call his sister and enlist her help. R.Doc.342-4 at 7-9; App.417-19.[7]

As he dialed his sister, Defendant Turner told him to "[g]et the fuck off that phone," so he walked to a different phone to make the call. R.Doc.342-4 at 9-10; App.419-20. As they spoke, he lowered his mask so his sister could hear him. R.Doc.342-4 at 10; App.420. Defendant Turner then pointed a can of pepper spray at his face and told him to "put that

---

[7] CJC did not give Darnell his seizure medication until a court ordered them to—a month and a half after his arrest. R.Doc.343-16 at 2; App.733.

motherfucking mask back on." R.Doc.342-4 at 11; App.421; R.Doc.343-17 at 00:25-00:52; App.734. He complied, but as Darnell told his sister what was going on, Officer Lewis told him he was "being too disrespectful" and ordered him to lockdown. R.Doc.342-4 at 12; App.422.

Before Darnell had a chance to comply, Defendant Turner sprayed him in the face. R.Doc.342-4 at 12; App.422; R.Doc.343-17 at 01:38-01:52; App.734. Defendant Turner later acknowledged that she sprayed Darnell because he did not lockdown, R.Doc.342-3 at 14; App.408, despite video evidence that she used chemical agents less than 18 seconds after the first order to lockdown. R.Doc.343-17 at 1:34-1:52; App.734.[8] Darnell then ran to the shower and got in without removing his clothes because he had never before been maced and was scared it would trigger a seizure. R.Doc.342-4 at 13; App.423.

**Second Use of Force.** When Defendants Alexander and Borders came into the shower area, Darnell placed his hands behind his back and

---

[8] Following the spray that is the basis for Darnell's claim, he tried to run to his cell. R.Doc.342-4 at 12; App.422. As he navigated through the room, he picked up chairs in "a defensive mode" to stop the officers from following him and "using this mace." R.Doc.342-4 at 20; App.430. These post-spray events are not relevant to this lawsuit about Turner's initial use of force.

they handcuffed him. R.Doc.342-4 at 14; App.424. They took him into the elevator, behind a wall in medical, and then to a visiting booth. R.Doc.342-4 at 14-17; App.424-27. Along the way, they repeatedly slammed Darnell's back and head against walls until he bled. R.Doc.342-4 at 14-15; App.424-25. Then they strangled him; when he said he couldn't breathe, Defendant Alexander told him that was "the whole point" and that they would "kill [his] little ass." R.Doc.342-4 at 15; App.425. The officers then pepper sprayed him twice more and left him handcuffed in the booth for hours. R.Doc.342-4 at 16; App.426. He could not breathe, threw up blood, and loudly begged for help. R.Doc.342-4 at 16; App.426.

Darnell did not receive medical attention and had a seizure that night. R.Doc.342-4 at 6-7, 16; App.416-17, 426. The pepper spray burned his skin and eyes for more than a week. R.Doc.342-4 at 24; App.434, R.Doc.342-4 at 30; App.440. And the assault by Defendants Alexander and Borders led to stabbing headaches that persist today. *Id*.

**Third Use of Force.** A few months later, Darnell was pepper sprayed again. During a unit-wide shakedown, Darnell followed officers into a visiting booth where he undressed, lifted his penis, turned around,

and bent over—all as commanded. R.Doc.342-4 at 20-21; App.430-31. Feeling "uncomfortable," Darnell jokingly asked one of the officers whether he "like[d] this job." R.Doc.342-4 at 21; App.431. In response, the officer ordered Darnell to be searched again and called Defendant Fowlkes over, who then "automatically sprayed" him. *Id*. Defendant Fowlkes left Darnell in the visiting booth for hours. R.Doc.342-4 at 2; App.432.

When Darnell returned to his cell, Defendant Fowlkes had shut off the water: neither the toilet nor sink worked for another day. R.Doc.342-4 at 26; App.436. Darnell had trouble taking his medication and could not stay hydrated as his medication required. *Id*.

### 4. *Derrick Jones.*

**First Use of Force.** Derrick asked Defendant Richard if he could move cells when his cellmate developed a high fever during a COVID outbreak. R.Doc.342-1 at 7; App.373. When she insisted he return to the cell he shared with his infected cellmate, he asked to speak with her supervisor and reiterated that he was "not sick." R.Doc.342-1 at 8; App.374. As they spoke, she sprayed him "right in [his] eyes." R.Doc.342-1 at 9; App.375.

As Defendant Richard later explained, she sprayed Derrick because of his "verbiage"—he was not physically resisting and even Defendant Richard acknowledged that his "arms [were] crossed." R.Doc.342-2 at 7; App.390. After she sprayed him in the face, Derrick raised his hands to protect himself and jolted forward into Defendant Richard. R.Doc.316-5 at 4; App.136, R.Doc.316-2 at 02.55-02.56; App.129.

**Second Use of Force.** Defendant Richard and several other officers quickly brought Derrick to the ground. R.Doc.316-7 at 1; App.140. They kicked him in the head and "sprayed and sprayed" him with chemical agents. R.Doc.342-1 at 9; App.375. They handcuffed Derrick on the ground and took him to medical. *Id*.

**Third Use of Force.** In medical, Derrick was "burning" and felt his lungs "closing up." R.Doc.342-1 at 10; App.376. Desperate for relief, he kicked the door of the secure cell and yelled for help. *Id*. Defendant Fowlkes opened the door and pepper sprayed Derrick again. *Id*. When other officers asked what was going on, Defendant Fowlkes said "let him marinate," and laughed. *Id*. He shut the door and left Derrick there. R.Doc. 343-7 at 9; App.590.

Following the attack, Derrick was permitted to wash his eyes, but not to shower or change clothes until eight days later. R.Doc.342-1 at 10-11; App.376-77. For days after the attack, Derrick struggled to breathe: "The more I tried to inhale, the more it felt like my lungs closed up." R.Doc.343-6 at 3-4; App.579-80. His eyes stung badly and it "seemed like [his] eyes were burnt." R.Doc.343-6 at 4; App.580.

**Water Shut-Offs.** Derrick also experienced "a lot" of water shut-offs. R.Doc.342-1 at 14; App.363. After one such shut-off, Derrick filed a grievance asking to "be treated like [a] human being." R.Doc.337-1 at 221; Sealed.App.221.

## II.  Procedural History

In 2021, Plaintiffs brought suit under 42 U.S.C. § 1983 against the City of St. Louis and individual officers at CJC. As relevant here, the operative complaint included Fourteenth Amendment excessive force claims against Officers Richard, Fowlkes, Turner, Alexander, Borders, Wills, and Jones; a *Monell* excessive-force claim against the City; and a *Monell* conditions claim against the City. R.Doc.131 at 32-42; App.81-91. Plaintiffs Marrell Withers and Darnell Rusan also brought an ADA claim

against the City. R.Doc.131 at 39-40; App.88-89.[9] The district court denied summary judgment on all claims.

## STANDARD OF REVIEW

Review of a district court's denial of summary judgment based on qualified immunity is *de novo* and is limited to "abstract issues of law." *Sterling v. Bd. of Trustees of the Univ. of Arkansas,* 42 F.4th 901, 904 (8th Cir. 2022) (cleaned up). In conducting this review, this Court must view the record "in the light most favorable" to the plaintiffs. *Id.*

## SUMMARY OF THE ARGUMENT

This Court should affirm the denial of qualified immunity to each Defendant Officer and dismiss the remainder of the appeal for lack of jurisdiction.

In asking this Court to reverse the denials of immunity, the Defendant Officers make two crucial errors. First, they repeatedly and improperly dispute the factual determinations underlying the qualified immunity analysis. Second, they make hardly any arguments about clearly established law, and instead insist that they did not commit

---

[9] Plaintiffs Derrick Jones and Jerome Jones brought a conditions-of-confinement claim against Defendant Fowlkes for punitive water shut-offs, but did not litigate that claim at summary judgment below.

constitutional violations under the wrong legal standard—one that was expressly rejected by the Supreme Court in *Kingsley v. Hendrickson,* 576 U.S. 389 (2015).

Under the proper analysis, each Defendant Officer violated clearly established law prohibiting the excessive use of chemical agents on restrained or passively resisting detainees. Defendants Wills and Jones did so when they twice sprayed Marrell—while he was handcuffed—for raising legitimate health concerns. Defendant Turner did so when she sprayed Darnell for taking too long to hang up the phone. Defendant Richard did so when she sprayed Derrick for declining to enter a COVID-positive area when he was uninfected. As for Defendant Fowlkes, he violated clearly established law *repeatedly*: by spraying a handcuffed Jerome for asking a question, by spraying Darnell for questioning the need for a second strip search, by spraying Derrick while he lay on the floor restrained by six officers, and by spraying Derrick again and leaving him to "marinate" in a locked room. Finally, Defendants Alexander and Borders do not even contest that they violated clearly established law by slamming Darnell's head against a wall, choking him, and pepper spraying him—all while he was handcuffed.

This Court should end its analysis there. Pendent appellate jurisdiction over the *Monell* claims exists only if they are inextricably intertwined with the qualified immunity questions properly on appeal. They're not: *Monell* and qualified immunity "require entirely different analyses." *Manning v. Cotton*, 862 F.3d 663, 671 (8th Cir. 2017). If this Court nevertheless exercises jurisdiction over the *Monell* claims, it should affirm. CJC's custom of using excessive chemical agents spans hundreds of incidents where detainees were needlessly sprayed while presenting no security threat and often while handcuffed or confined. Yet CJC leadership—well aware of this practice—allowed the practice to continue. As for the water shut-off *Monell* claim, officers routinely cut water to cells, depriving detainees of drinking water, functional toilets, and showers. Both Commissioners were told about the shut-offs and did nothing.

This Court also lacks pendent appellate jurisdiction over the ADA appeal because the failure to accommodate disabilities is not inextricably intertwined with qualified immunity. If this Court nevertheless exercises jurisdiction, it should affirm. The City does not contest that Marrell and

Darnell have qualifying disabilities, and the ADA is broadly construed to cover uses of force in jails.

## ARGUMENT

## I.    Defendant Officers are not entitled to qualified immunity.

Defendants' appeal is preliminarily doomed because their summary judgment briefing before the district court contained virtually no argument or citation to legal authority that addressed clearly established law. Qualified immunity requires a two-step inquiry in which courts determine (1) whether the facts in the light most favorable to the plaintiff demonstrate a constitutional deprivation; and (2) whether the right was clearly established. *Poemoceah v. Morton Cnty., N. Dakota*, 117 F.4th 1049, 1054 (8th Cir. 2024) (citation omitted).

Despite reciting the words "clearly established," Defendants only argued before the district court that their actions were "objectively reasonable." Moreover, their arguments were based on disputed facts. They failed to provide legal support for the argument that, even if they violated the Constitution, that violation was not clearly established at the time of the incident. As such, Defendants waived any argument that the rights at issue were not clearly established. *Milligan v. City of Red*

*Oak, Iowa,* 230 F.3d 355, 360 (8th Cir. 2000) (explaining appellant waives issue by failing to "support his assertion with any argument or legal authority"). Should this Court nevertheless undertake a qualified immunity analysis, the Defendant Officers still would not prevail because they violated Plaintiffs' clearly established rights.

## A. The district court conducted its qualified immunity analysis at the correct level of generality.

Contrary to Defendants' argument, *see* OB21-25, the district court conducted an appropriately thorough qualified immunity analysis and correctly denied immunity to the Defendant Officers. Because time is a "precious commodity," district courts need not make an "exhaustive written analysis of the merits of each claim as to each defendant." *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 806 (8th Cir. 2010). It needed only to set forth findings of fact and conclusions of law "sufficient to permit meaningful appellate review." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (citation omitted). It did so.

First, it described the relevant facts as to each use of force. R.Doc.383 at 2-4; App.6080-6082. It then detailed the factors relevant to the excessive force analysis: the amount of chemical agents applied, the officers' legitimate safety concerns, and whether plaintiffs were left to

suffer in mace-soaked clothing. R.Doc.383 at 8-10; App.6086-6088; *see*

*Kingsley*, 576 U.S. 389 (directing consideration of such factors in

excessive force analysis). It then correctly applied "these factors to the

facts of the case" and concluded that the uses of mace were "objectively

unreasonable." R.Doc.383 at 9; App.6087. Indeed, it specifically

concluded that immunity was not warranted for "the particular

instances" of force here. R.Doc.383 at 10; App.6088. That suffices as

analysis of each Defendant Officers' actions.

This Court's opinion in *Heartland* is instructive. There, this Court

held that the district court properly analyzed each officer's conduct

despite referring to them as a collective. *Heartland*, 595 F.3d at 806.

Although the district court in that case denied immunity to "all

defendants," it first carefully recited the facts and recognized that

qualified immunity is to be applied to "a particular defendant's conduct."

*Anderson v. Waddle*, No. 4:06CV919 HEA, 2008 WL 4561467, at *1-2, 4-

8 (E.D. Mo. Oct. 10, 2008), *aff'd in part, appeal dismissed in part sub nom.*

*Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798 (8th Cir. 2010).

Likewise, in denying immunity to all defendants in this case, the district

court described each use of force and then recognized that the evidence

was sufficient as to those "particular instances" of force. R.Doc.383 at 10; App.6088. So, as in *Heartland*, the district court did not "shirk its duty to gauge the Officials' conduct individually." 595 F.3d at 806.

Defendants' citations to *Walton* and *Robbins* are inapposite. *Walton v. Dawson* addresses a separate issue altogether where the district court improperly relied on "speculation, conjecture, or fantasy" to rebut the Defendant Officer's testimony. 752 F.3d 1109, 1125 (8th Cir. 2014). Here, Defendants do not argue that the district court made that error. And in *Robbins v. Becker*, the lower court failed to even mention the qualified immunity standard, making appellate review ineffective. 715 F.3d 691, 694-95 (8th Cir. 2013). That is distinct from the decision here, where the district court spent six pages on the qualified immunity analysis. R.Doc.383 at 6-11; App. 6084-6089.

Even if the district court's analysis was lacking, this Court "must determine which facts it likely assumed by viewing the record in the light most favorable to the plaintiff." *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015); *see also Behrens v. Pelletier,* 516 U.S. 299, 313 (1996) (noting appellate court would need to undertake a "review of the record to determine what facts the district court . . . likely assumed"). Only when

that is "impossible" should the case be remanded for additional explanation. *Walton*, 752 F.3d at 1116-17; *see also Jones v. McNeese*, 675 F.3d 1158, 1163 (8th Cir. 2012); OB14-15 (acknowledging remedy for deficiency is not reversal but remand).

### B. The district court properly determined that the Defendant Officers violated clearly established constitutional rights.

The district court correctly denied qualified immunity to the Defendant Officers. In arguing otherwise, Defendants rely on the incorrect legal standard, misrepresent this Court's clearly established precedent on chemical agents, and take facts in their favor. Applying the correct law to the facts taken in the light most favorable to Plaintiffs, the Defendant Officers' decisions to inflict chemical agents on detainees who presented no physical threat violated clearly established law.

### *1. Defendants apply the wrong legal standard.*

As a threshold issue, Defendants set forth the wrong legal standard for examining excessive force against pretrial detainees. Defendants acknowledge that such claims are analyzed under the Fourteenth Amendment, not the Eighth Amendment, but then incorrectly write that this "makes little difference as a practical matter" because the two

amendments offer "the same protection." OB26-27. That is flat wrong.

The Supreme Court squarely held that while convicted prisoners proceeding under the Eighth Amendment must show that force was used "maliciously and sadistically" to cause harm, pretrial detainees proceeding under the Fourteenth Amendment—who are entitled to the constitutional presumption of innocence—stand in a different position. *Kingsley*, 576 U.S. at 400. Pretrial detainees must only show that the force used against them was "objectively unreasonable." *Id.* at 397. That objective analysis requires an inquiry into "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. It does not include a subjective component. *Id*. at 395; *see also Glover v. Paul*, 78 F.4th 1019, 1022 (8th Cir. 2023) (noting *Kingsley* "deleted the subjective prong").

To be sure, when an action violates the Eighth Amendment it *necessarily* violates the Fourteenth Amendment, so use-of-force cases finding a violation under the Eighth Amendment standard are sufficient

to put an official on notice that the same use of force would violate the Fourteenth Amendment. *Glover*, 78 F.4th at 1022. Plaintiffs thus rely on several Eighth Amendment cases to clearly establish the law. *See infra*. Of course, because the Eighth Amendment standard is more stringent, it does not follow that a *grant* of immunity under the Eighth Amendment requires the same under the Fourteenth Amendment.

### 2. Using large amounts of chemical agents on passive, non-violent detainees violates clearly established law.

In claiming qualified immunity, Defendants suggest that *any* degree of pretrial detainee noncompliance—even questions or momentary hesitations—justifies unlimited force against the detainee, regardless of whether there was any physical danger to an officer or inmate. Wrong.

This Court has held that "clearly established" law prohibits force unless "the inmate's noncompliance also poses a threat to other persons or to prison security." *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002). In other words, "summary force" cannot be "the de jure method of discipline where security concerns are not immediately implicated." *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993). This rule has

particular force when prisoners are "confined to their cell[s]." *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002).

This Court has consistently applied this clearly established law in cases about pepper spray. In *Treats*, prison staff sprayed the plaintiff "with a prolonged burst of [] pepper spray" for failure to follow an order before slamming him to the floor. 308 F.3d 868, 870-72 (8th Cir. 2002). This Court affirmed the district court's order denying qualified immunity, holding "correctional officers do not have a blank check to use force whenever a prisoner is being difficult" and "pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions." *Id.* at 873, 875. In so holding, the Court rejected the argument that pepper spray is justified on any "recalcitrant" detainee. *Id.* at 872.

Likewise, in *Walker v. Bowersox*, this Court rejected an argument that pepper spray was justified against an inmate who refused multiple orders to put a tray through the food port. 526 F.3d 1186, 1188 (8th Cir. 2008). Despite the officer's contention that the behavior "disrupt[ed] the unit routine" and that "trays could be used as weapons," the evidence still supported a jury issue where the inmate was in a locked cell and the

officer deployed "a super-soaker used for riot situations" without warning. *Id.* at 1189.

In *Lawrence*, this Court found evidence supporting an excessive force claim where—five hours following a prison riot—officers pepper sprayed prisoners in locked cells for talking back. 297 F.3d at 730. The Court rejected arguments that the prisoners were "recalcitrant" and pointed out that questioning abusive instructions did not justify soaking them in pepper spray. *Id.* at 732. It then affirmed the denial of immunity to an officer who failed to protect the prisoners from that "unnecessary pepper spray." *Id.* at 733.

This Court has also been clear that the *amount* of spray matters. Force is excessive when officers use "unnecessary 'super-soaker' quantities of the chemical," refuse "to allow the victim to wash off the painful chemical for days," or use "additional physical force." *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014); *see also Lawrence*, 297 F.3d at 730 (non *de minimis* injury where prisoners sprayed from large canister); *Foulk v. Charrier*, 262 F.3d 687, 702 (8th Cir. 2001) (reasonable

jury could find excessive force where officer pepper sprayed plaintiff's face at close range through window into locked cell).[10]

A "robust consensus" of persuasive authority confirms this clearly established law. *See Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 839 (8th Cir. 2021). This Court's sister circuits routinely prohibit the use of chemical agents on prisoners not presenting a threat. *See, e.g.*, *Segrain v. Duffy*, 118 F.4th 45, 65 (1st Cir. 2024) ("clearly established law" from 2018 "prohibited" pepper spraying person who was "restrained and did not pose any reasonable threat"); *Greene v. Feaster*, 733 F. App'x 80 (4th Cir. 2018) (finding "objectively unreasonable" to pepper spray person "absent any provocation"); *Est. of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) (inflicting chemical agents on "a fully restrained, incapacitated individual is vicious and unconscionable"); *Atencio v. Arpaio*, 674 F. App'x 623, 625-26 (9th Cir. 2016) (finding reasonable

---

[10] Insofar as *Kingsley* requires the same objective reasonableness standard as in the Fourth Amendment, this Court's Fourth Amendment precedent also supports that officers may not use chemical agents absent a security threat. *Watkins v. City of St. Louis, Missouri*, 102 F.4th 947, 952 (8th Cir. 2024) (finding "clearly established" as of 2016 that it constitutes excessive force to spray "restrained and nonresistant" individual).

officer would have been on notice force was excessive when detainee "posed no threat," was "already physically restrained" and was "at most passively resisting"); *Jacoby v. Mack*, 755 F. App'x 888, 897 (11th Cir. 2018) (finding objectively unreasonable use of spray where inmate was not combative and officers did "inadequate decontamination").

As such, the clearly established law from both this Court and sister courts supports the district court's denial of qualified immunity to all Defendant Officers.

### 3. *Each use of force violated clearly established rights.*

Given the above case law, the facts seen in the light most favorable to the Plaintiffs show each Defendant Officer used excessive force in violation of Plaintiffs' clearly established rights. In arguing otherwise, Defendants impermissibly ask this Court to wade into factual disputes. But this Court "cannot accept the contention of the officers" where they make arguments about "which facts a party may, or may not, be able to prove at trial." *Ellison v. Lesher*, 796 F.3d 910, 915 (8th Cir. 2015) (cleaned up). Rather, on interlocutory appeal, this Court's jurisdiction "is limited to resolving abstract questions of law related to the qualified immunity determination—typically, whether the allegedly infringed

federal right was clearly established." *Thompson*, 800 F.3d at 982-83. On proper construction of the facts, each Defendant Officer violated clearly established law.

### a. Marrell Withers

The district court properly denied immunity to Defendants Wills and Jones for twice spraying Plaintiff Marrell Withers with chemical agents when he was "in handcuffs" and "not physically resisting"—all for raising legitimate concerns about his health. R.Doc.383 at 4; App.6082.

Defendants put forward entirely different facts by invoking the *Scott v. Harris* exception, *see* OB41, but that exception does not apply. Although Defendants assert that the surveillance video contradicts the district court's findings, they do not explain how. Indeed, the video supports the denial of immunity. It shows that when Marrell said he was going to "break the computer," he was incapable of doing so as he was handcuffed and sitting feet away. R.Doc.342-5 at 11; App.451. In fact, it shows Marrell sitting while handcuffed for almost a full minute before the first spray. R.Doc.342-7 at 7:44-8:47; App.467. Nothing about his demeanor suggests that he was a threat to officers or property. *Id.* In the video, Marrell tells Defendants that he has asthma. R.Doc.342-6 at 12;

App.469. Nevertheless, Defendant Jones pepper sprays him in the face. R.Doc.342-7 at 8:41-8:50; App.470. Twenty seconds later, Defendant Jones sprays him again from one foot away as Marrell faces a wall. R.Doc.342-6 at 10; App.467.

What's more, Defendants' characterization of the video ignores their own admissions. Both Defendant Jones and Wills testified that Marrell did not present a threat before he was sprayed. R.Doc.342-6 at 9; App.466; R.Doc.342-8 at 7; App.477. And in direct contradiction to Defendants' arguments, Defendant Jones testified that he understood Marrell as saying "You better not spray me because I've got asthma" rather than consenting to the attack as Defendants now ludicrously suggest. R.Doc.342-6 at 12; App.469. Given that objective reasonableness is evaluated from "the point of view of the officer," *Marks v. Bauer*, 107 F.4th 840, 846 (8th Cir. 2024), it is striking that even the officers acknowledged spraying Marrell despite knowing he had asthma and concluding he posed no threat.

As described above, clearly established law prohibits pepper spraying a restrained individual who questions correctional officers. *See supra* Section I.B.2. In *Treats*, the Eighth Circuit found pepper spray

unjustified where a detainee questioned an officer's directive but "otherwise pose[d] no threat." 308 F.3d at 873. Likewise, in *Tatum v. Robinson*, this Court found pepper spray unreasonable—even when the plaintiff was actively arguing with an officer—because the plaintiff was not an immediate threat. 858 F.3d 544, 550 (8th Cir. 2017). Here too, Marrell posed no threat—he was fully restrained. Defendants' argument that Marrell's "suspected COVID diagnosis" constituted a "threat," *see* OB43, is nonsensical. The case they rely on to make the point—*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020)—was not about the use of force.

Defendants' new argument on appeal—that Defendant Wills is entitled to immunity because he did not "personally participate" in the force—is waived. *Smith v. City of Des Moines*, 99 F.3d 1466, 1473 (8th Cir. 1996) ("We will not reverse a grant of summary judgment on the basis of an argument not presented below."). Regardless, it is a violation "if the official knows that another official is using excessive force" and "fails to intervene." *Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014). Here, not only did Defendant Wills know about the force, he ordered it. R.Doc.342-6 at 9; App.466. This makes Defendants' reliance on *S.M. v. Krigbaum* erroneous—there, the Court found the official was not on

notice of the coming constitutional violation. 808 F.3d 335, 340 (8th Cir. 2015). Because Defendant Wills directed the spray, and Defendant Jones inflicted it, neither Defendant is entitled to qualified immunity.

### b. Jerome Jones

Defendant Fowlkes argues that it was "objectively reasonable" for him to spray Jerome and leave him in a mace-filled booth for twenty-five minutes—even though Jerome was handcuffed—simply because Jerome did not "comply with orders" to move cells. OB34-35. Wrong: that conduct violates the Constitution and clearly established law.

It is undisputed that Jerome was handcuffed and not physically resisting at the time of the spray. R.Doc.343-3 at 5-6; App.551-52. Nevertheless, Defendant Fowlkes took Jerome to a closed room, sprayed a large can of mace into his face from less than one-foot distance, and then left him in the mace-filled room for twenty-five minutes. R.Doc.343-3 at 6, 11; App.552, 557. Jerome begged for help and shouted that he could not breathe. Doc.343-3 at 11; App.557. He had such difficulty getting air that he laid on the floor "to suck some air from under the door." Doc.343-3 at 6; App.552.

This attack violated clearly established law holding that concerns about "order and discipline" do not justify force "on difficult inmates not posing a real threat." *Treats*, 308 F.3d at 872 (citation omitted). For instance, in *Foulk*, this Court found that a correctional officer violated the Eighth Amendment by spraying a detainee who became angry at a directive and demanded to speak to a different guard. 262 F.3d at 692. As did Defendant Fowlkes, the officer in *Foulk* sprayed the detainee in the face and then left him alone in a room—though the detainee in *Foulk* was given a shower in two days, whereas Jerome waited weeks for one. *Id.* And in *Lawrence*, this Court found a violation where a guard deployed chemical agents on prisoners confined in a secured room who posed no safety threat. 297 F.3d at 730-33. These cases put every reasonable officer on notice that it would be unconstitutional to spray Jerome for asking why he had to move cells. He was handcuffed, made no threatening movements or verbal threats, and was in a locked booth when Defendant Fowlkes deployed the chemical agents. R.Doc.343-3 at 5; App.551.

Defendants raise two arguments for the first time on appeal: that Jerome experienced only *de minimis* harm and that Defendant Fowlkes

was not personally involved in depriving him of decontamination. OB35-36. Because these arguments were not raised below, this Court should not consider them. *Setchfield v. St. Charles Cnty.*, 109 F.4th 1084, 1090 (8th Cir. 2024). Both are also plainly incorrect.

First, spraying a detainee at close range with riot-sized canisters of OC spray (especially without efforts to remove the spray soon after) can cause greater than *de minimis* harm. *Lawrence*, 297 F.3d at 732. Here, Jerome had difficulty breathing, he could not see, and his eyes, face, and chest were burning. Doc.343-3 at 11; App.557. He was in pain for days because he had no water in his cell, and for weeks he woke in the night unable to fully breathe. R.Doc.343-3 at 7-9; App.553-55.

Second, Defendant Fowlkes prolonged the effects of the spray. CJC policy requires "responding Correctional Officers" to provide clean clothing and "escort the inmate to the Medical Unit for treatment." R.Doc.131-1 at 6-7; Supp.App.293-94. Policy also says the "area supervisor" must offer "immediate medical attention." R.Doc.316-17 at 5; App.169. As an officer on the scene and a Lieutenant, Defendant Fowlkes was supposed to decontaminate Jerome immediately. Instead, after spraying Jerome, Defendant Fowlkes stated "Yeah, he feel it. Leave him

in there." R.Doc.343-3 at 6-7; App.552-53. He then left him in there for twenty-five minutes and did not take Jerome to medical. *Id*. A reasonable jury could find Fowlkes responsible for not just deploying chemical agents needlessly, but for cruelly increasing the painful effects of the spray.

### c. Darnell Rusan

**Spray by Lt. Turner.** In arguing Defendant Turner's use of force on Darnell passed constitutional muster, Defendants improperly rely on facts that are disputed by both Darnell's testimony and the video footage. On the proper facts, Defendant Turner violated clearly established law.

Defendant Turner's needless spray was objectively unreasonable. *Kingsley* requires considering the severity of the security problem, whether the plaintiff was resisting, and any effort made by the officer to temper the amount of force. 576 U.S. at 397. Here, there was no security problem. Darnell testified that he complied with multiple orders from Defendant Turner and Officer Lewis to move to another phone and to put a mask on. R.Doc.342-4 at 9-10; App.419-20. And the video shows that the officers yelled at him to "step in" just 18 seconds before Defendant Turner sprayed him. R.Doc.343-17 at 1:34-1:52; App.734. Finally,

Defendant Turner did not temper the amount of force as she sprayed Darnell with a "riot sized canister" almost immediately after directing him to lockdown. R.Doc.342-4 at 12; App.422; R.Doc.343-17 at 01:38-01:52; App.734. This is a constitutional violation.

It is also "clearly established" that such force is excessive where a prisoner's "noncompliance" poses no "threat to other persons." *Treats*, 308 F.3d at 875 (finding violation where detainee sprayed for questioning directive); *see also Walker*, 526 F.3d at 1189 (no riot-sized spray without warning); *Lawrence*, 297 F.3d at 730-33 (talking back does not justify spray); *supra* Section I.B.2. Defendants' comparison to *Burns v. Eaton* does not help them: there, the plaintiff did not just refuse orders, but threw things and spit on staff. 752 F.3d 1136 at 1138, 1140 (8th Cir. 2014). Noting the Eighth Amendment's subjective standard is "less protective" than the "objectively reasonable" test, the Court found a *limited* application of pepper spray was permissible. *Id*. at 1139-40. Of course, Darnell need not show "malicious and sadistic" intent under the Fourteenth Amendment. *See supra* Section I.B.1.

To avoid the necessary conclusion that Defendant Turner violated clearly established law, Defendants impermissibly interpret the facts in

their favor. First, they argue that Defendant Turner "believed Rusan to be under the influence," OB37, but Defendant Turner's post-incident report says nothing about drug use, R.Doc.343-18 at 3; App.737. Moreover, Darnell disputes being under the influence of illegal drugs. R.Doc.342-4 at 7; App.417. Second, Defendants argue that Darnell "cursed at them" and threatened Defendant Turner about "what he was going to do to" her. OB38. But Darnell insists he was speaking with his sister and was just asking her to come down and file a complaint. R.Doc.342-4 at 11-12; App.421-22. Third, Defendants say Darnell "refused" to step into his cell, OB38, but Darnell barely had time to comply with that order before being sprayed. R.Doc.343-17 at 1:34-1:52; App.734. A reasonable jury could resolve all three factual disputes in Darnell's favor—and on those facts, Defendant Turner violated clearly established law.[11]

**Physical assault and spray by Defendants Alexander and Borders.** Defendants Borders and Alexander present no argument. The only time their names appear is in the first sentence of the opening brief.

---

[11] Defendants' discussion of Darnell's post-spray conduct, *see* OB38, is irrelevant to the justification for the spray itself.

As such, they have waived any arguments and the claims against them should be set for trial. *Milligan*, 230 F.3d at 360. In any case, they violated clearly established law.

After the incident with Defendant Turner, Defendants Border and Alexander handcuffed Darnell. R.Doc.342-4 at 14; App.424. Then they repeatedly slammed his head against the wall, choked him, maced him in a visiting booth, and left him there. R.Doc.342-4 at 14-16; App.424-26. Throughout, they threatened him: "we'll kill your little ass in here." R.Doc.342-4 at 15; App.425.

"The law has been settled for at least three decades that repeatedly striking a fully restrained inmate violates the Eighth Amendment." *Fisherman v. Launderville*, 100 F.4th 978, 981 (8th Cir. 2024); *see also Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) ("clearly established law" prohibits "beating a handcuffed convict"). The same is true of pepper spraying a restrained detainee. *See supra* Section I.B.2; *see also Dean v. Jones*, 984 F.3d 295, 305-08 (4th Cir. 2021) (pepper-spraying then slamming handcuffed prisoner against wall violates Eighth Amendment).

**Spray by Defendant Fowlkes.** Defendants argue that the district court erred in denying Defendant Fowlkes qualified immunity because, according to Defendants, Darnell persistently refused to cooperate with a strip search. OB40. But this Court is "required to look beyond" Defendants' mischaracterization of the facts on interlocutory appeal. *Taylor v. St. Louis Cmty. Coll.*, 2 F.4th 1124, 1127 (8th Cir. 2021). On the properly construed facts, Defendant Fowlkes violated clearly established law.

There was no "persistent refusal to be strip searched." *Contra* OB40. Darnell complied fully with an initial strip search. R.Doc.342-4 at 20-21; App.430-31. It was only after Darnell balked at having to undergo a *second* strip search as punishment that Defendant Fowlkes came over. R.Doc.342-4 at 21; App.431. Darnell explained to Defendant Fowlkes that he "just did everything" and didn't like that the officer told him to "bend over and spread my ass again." *Id.* Rather than listen, Defendant Fowlkes told him "Get with it," sprayed him with a riot-size can, and left him in a mace-filled visiting booth. R.Doc.342-4 at 2, 21; App.431; App.432. This Court has found a violation on nearly identical facts. *Lawrence*, 297 F.3d at 732 (violation to spray prisoners "confined to their

cell" with large can of pepper spray for questioning directive); *see also supra* Section I.B.2.

Defendants' citation to *Jones v. Shields*, 207 F.3d 491 (8th Cir. 2000), doesn't upset this clearly established law. *See* OB40. In *Jones*, the prisoner was sprayed after refusing several orders, speaking aggressively, and advancing towards the officer. 207 F.3d at 493-97. In contrast, Darnell posed no threat. Moreover, *Jones* rests primarily on a limited application of pepper spray which was immediately remedied. *Id.* at 495. Here, CJC's own records confirm that Darnell was enclosed in the visiting booth after the riot sized canister was deployed on him. R.Doc.342-4 at 2; App.432. Finally, of course, *Jones* was decided under the inapposite "malicious or sadistic" test reserved for the Eighth Amendment. 207 F.3d at 497.

### d. Derrick Jones

**Spray by Defendant Richard.** In justifying Defendant Richard's first spray of Derrick, Defendants again impermissibly rely on facts construed in their favor. *Taylor,* 2 F.4th at 1127. On the properly construed facts, Defendant Richard violated clearly established law.

Derrick's cellmate was exhibiting signs of COVID-19 and his entire unit had either tested positive or demonstrated signs of infection. R.Doc.342-1 at 7; App.373. While Defendants argue that Derrick had COVID-19, Derrick testified that he wanted to move cells because he had no symptoms and was still mercifully uninfected. R.Doc.342-1 at 6-8; App.373-74. Defendant Richard then left the wing and returned with a riot-sized canister of pepper spray. R.Doc.342-1 at 9; App.375, R.Doc.342-2 at 5; App.388. "Seconds" later, Defendant Richard "sprayed [him] right in [his] eyes . . . by surprise." R.Doc.342-1 at 9; App.375. At the time, Derrick posed no threat. *Id.* Defendant Richard herself acknowledged that he had his "arms crossed." R.Doc.342-2 at 7; App.390. She said she sprayed him because of his "verbiage," *id*, even though CJC policy authorizes spontaneous force only for "active resistance above and beyond mere non-compliance with verbal command." R.Doc.316-17 at 4; App.168.

On these facts—Derrick standing still and merely questioning the need to be housed with COVID-positive people—there is no objective need for deployment of a riot-sized canister of OC spray. Clearly established law holds that chemical agents are not constitutionally permissible for

minor passive resistance. *See supra* Section I.B.2. The violation is particularly clear as Defendant Richard used large quantities of pepper spray. *Lawrence*, 297 F.3d at 732. Defendants try to avoid this clear law by analogizing to *Hampton v. City of St. Louis*, 2022 WL 2643507 (E.D. Mo. July 8, 2022), a district court case litigated by a *pro se* litigant. *See* OB29. But there, the officer was alone supervising 50 prisoners, used limited pepper spray, and provided immediate medical care. *Id.* at *3. The court also found that the plaintiff threatened the officer's safety. *Id.* at *4. In contrast, Derrick threatened no one; at most, he briefly crossed the officer area before quickly moving away. R.Doc.316-2 at 0:50-0:55; App.129.

To avoid the clearly established law set out in *Treats*, *Lawrence*, *Walker*, and *Foulk*, Defendants twist the facts and the law. On the facts, they argue that Derrick "never directly contradicts" that Defendant Richard warned him before deploying spray, but Derrick specifically testified that "I didn't know she was going to do it. Like she just did it by surprise." R.Doc.342-1 at 9; App.375. And there is no audible warning in the video. R.Doc.316-2 at 2:50-254; App.129. On the law, Defendants newly argue that "there is no clearly established law" requiring officers

to warn "recalcitrant" detainees before spraying. OB31. Not only is this argument waived, *see Milligan*, 230 F.3d at 360, but it is also wrong because a warning does not transform an otherwise unconstitutional spray into a constitutional one. *See Hickey*, 12 F.3d at 756, 759 (finding violation where force was excessive despite multiple warnings).

**Spray by Defendant Fowlkes in the dormitory.** Defendants continue to construe facts in their favor by stating that Defendant Fowlkes sprayed Derrick only after Derrick "attacked" Defendant Richard. OB31. Derrick denies this, explaining that he instinctively raised his arms to block the OC Spray. R.Doc.316-5 at 4; App.136. Officers then took Derrick to the floor and, only after he was on the floor, kicked and sprayed him with mace. R.Doc.342-1 at 9; App.375. Contrary to Defendants' assertion, *see* OB31, it is unclear from the video whether Derrick is resisting at all given the angle and number of officers involved. R.Doc.316-2; App.129. Under the facts seen in the light most favorable to Derrick, he was sprayed only after he was restrained by six officers. Using force on a "fully restrained inmate" is a clearly established violation. *Fisherman*, 100 F.4th at 981-82 (collecting cases); *see also Thomas v. City of St. Louis,* No. 4-18-CV-01566, 2021 WL 4622502, at *9

(E.D. Mo. Oct. 7, 2021) (finding "deployment of pepper spray" on "non-resisting individual" unreasonable and collecting cases); *supra* Section I.B.2.

Defendants only cited authority, *Laney v. City of St. Louis*, 56 F.4th 1153 (8th Cir. 2023), changes nothing because the plaintiff in that case posed a visible threat during a "fast moving" and "unruly protest." *Id.* at 1156. Meanwhile, Derrick was not holding on to or hitting the officers. R.Doc.342-1 at 9-10; App.358-59. He explained: "I'm on the ground and I just feel me getting kicked in my head and getting sprayed by the Mace." R.Doc.342-1 at 10; App.359. Accepting Derrick's version of the facts as true, Derrick was passive, supine, and being attacked by multiple officers when Defendant Fowlkes dispersed multiple bursts of OC spray at close range. At the time, he posed no threat, and the use of force violated clearly established law.

**Spray by Defendant Fowlkes in medical.** Defendants acknowledge Defendant Fowlkes sprayed Derrick again while he was handcuffed and restrained in a locked room in medical. OB32. They make the new (and therefore waived) argument that Defendant Fowlkes did

not violate clearly established law because Derrick was yelling. In any case, that argument has no purchase.

To start, Derrick explained that Defendant Fowlkes sprayed him "for about seven seconds" while he was "screaming" and "burning." R.Doc.342-1 at 10; App.376. After spraying him, Defendant Fowlkes said to let him "marinate," and he and other officers were "laughing and making a joke out of it." *Id.* At least since 2002, it has been clearly established that guards cannot pepper spray detainees who are confined in a room—it makes no difference if they verbally express frustration with officers. *Lawrence*, 297 F.3d at 730-33. Indeed, the violation here is even more egregious than in *Lawrence*, where the plaintiffs were left in their pepper-sprayed clothes for only ten minutes before being brought to the shower. *Id.* at 730. Here, Derrick was not permitted to change clothes or shower for eight days. R.Doc.342-1 at 10-11; App.376-77.

Defendants rely on the Seventh Circuit's language in *Soto v. Dickey,* 744 F.2d 1260 (7th Cir. 1984), to argue that chemical spray is not a "per se violation" even if the person is locked in a cell. *See* OB32-33. It may not be a *per se* violation, but as *Soto* itself explains, spraying into a cell is a violation if the officer used "chemical agents in quantities greater than

necessary or for the sole purpose of punishment or the infliction of pain."

744 F.2d at 1270. Deploying seven seconds of a riot-sized cannister on

Derrick while he was locked in a room and handcuffed—all for yelling—

and then letting him "marinate" in chemical agents certainly meets even

*Soto*'s heightened Eighth Amendment standard. Under *Soto*, *Lawrence*,

and a host of other caselaw, gratuitous force on a "fully restrained

inmate" violates clearly established law. *See Fisherman*, 100 F.4th at

981-82 (collecting cases from circuits establishing same rule).

*

In conclusion, to reach Defendants' "legal arguments" that the

Defendant Officers responded reasonably and did not violate clearly

established law, this Court would have to "to exceed [its] jurisdiction and

cast aside the district court's factual findings, analyze the factual record,

and resolve genuine factual disputes against the non-moving party."

*Taylor*, 2 F.4th at 1127. As this Court has been clear: "This we cannot

do." *Id.* On the properly construed facts, each Defendant Officer violated

clearly established law. The district court's denial of qualified immunity

to each officer should be affirmed.

## II. The City's *Monell* appeals fail.

### A. This Court lacks pendent appellate jurisdiction over the *Monell* appeals.

The denial of summary judgment on a *Monell* claim is "not immediately appealable" so the "only remotely plausible argument for exercising jurisdiction" over such an appeal is through pendent appellate jurisdiction. *Shannon v. Koehler*, 616 F.3d 855, 865 n.8, 866 (8th Cir. 2010). Pendent appellate jurisdiction, in turn, only applies if the pendent claim is "inextricably intertwined"—meaning "subsumed in" or "coterminous with"—the appealable claim. *Id.* at 866 (cleaned up). This standard is satisfied only in "exceptional circumstances." *Smith v. Conway Cnty.*, 759 F.3d 853, 857 (8th Cir. 2014) (cleaned up). No such circumstances exist here: qualified immunity and *Monell* "require entirely different analyses." *Manning*, 862 F.3d at 671.

### 1. There is no jurisdiction over the excessive force Monell *appeal.*

A *Monell* claim asks "whether a city's policy, customs, or usage caused the plaintiff's injuries," and that "is a separate inquiry from whether" individual officers are entitled to qualified immunity. *Shannon*, 616 F.3d at 866 (cleaned up). That is, the excessive-force *Monell* claim turns on whether the City's indifference to the routine and

unconstitutional overuse of chemical agents on non-violent or restrained people caused plaintiffs' injuries, while the qualified immunity inquiries ask whether specific attacks by specific defendants violated clearly established law. Because these questions require "entirely different analyses" there is no pendent appellate jurisdiction. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1270 (8th Cir. 1996); *see also S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 854 (8th Cir. 2013) (dismissing *Monell* appeal because resolving qualified immunity inquiry "would not determine" municipal liability). Despite this clear caselaw, the City argues that qualified immunity and *Monell* are inextricably intertwined because both require proving a "defendant-officer's underlying violation of a plaintiff's clearly established constitutional rights." OB47. That's wrong for three reasons.

First, municipal liability does not require proving a "clearly established" constitutional violation—just a constitutional violation. *Thurmond v. Andrews*, 972 F.3d 1007, 1013 (8th Cir. 2020). So, even if this Court reversed the denial of immunity to all the individual officers in this appeal on clearly established grounds—an unlikely outcome, *see*

*supra* Section I—"it hardly follows . . . that the City is thereby immune." *Webb v. City of Maplewood*, 889 F.3d 483, 486-87 (8th Cir. 2018).

Second, the underlying constitutional violation for municipal liability may be the result of one officer's conduct or "the combined actions of multiple officials or employees." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). So, even if this Court concludes that each individual defendant did not violate the Constitution, it would not "necessarily resolve[]" whether the combined actions of officers established the requisite constitutional violation for *Monell* purposes. *Shannon*, 616 F.3d at 866.

Third, the City has not appealed the denial of qualified immunity to Defendants Borders and Alexander, leaving untouched the district court's determination that they violated plaintiffs' clearly established rights. *See* OB25-46; R.Doc.383 at 1-14; App.6079-92. Those violations by Defendants Borders and Alexander can serve as the basis for municipal liability, regardless of how this Court rules on the other qualified immunity appeals. Thus, the qualified immunity analysis in this appeal will not "necessarily resolve[]" the excessive-force *Monell* claim, and this Court lacks jurisdiction over it. *Shannon*, 616 F.3d at 866.

### 2. There is no jurisdiction over the water shut-off *Monell* appeal.

The water shut-off *Monell* appeal is not "inextricably intertwined" with any qualified immunity inquiry on appeal. Plaintiffs did not oppose summary judgment on the individual conditions claim against Defendant Fowlkes and, in any case, "situations may arise where the combined actions of multiple officials or employees" support municipal liability even "where no one individual's actions are sufficient to establish personal liability." *Speer*, 276 F.3d at 986. As such, this Court lacks jurisdiction to review the denial of summary judgment to the City on the water shut-off *Monell* claim.

### B. The district court correctly denied summary judgment on the excessive-force *Monell* claim.

If this Court exercises jurisdiction over the excessive-force *Monell* appeal, it should affirm the denial of summary judgment. The evidence easily establishes material disputes of fact on all three elements: (1) CJC has a "continuing, widespread, persistent pattern of unconstitutional misconduct," (2) policymaking officials are deliberately indifferent to that misconduct, and (3) the custom is the "moving force" behind the plaintiffs' injuries. *See Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998).

The evidence is so overwhelming, in fact, that the City makes no argument about the second or third prongs at all. *See* OB51-56.

### 1. *Officers routinely use excessive chemical agents on passively resisting or restrained detainees.*

A "widespread" custom exists where there is a pattern of similar conduct. *Ware*, 150 F.3d at 880. Here, officers have been using excessive chemical agents on restrained or passively resisting detainees for years.

A custom may be established by a "handful" of similar incidents. *Id.* at 881. Indeed, as few as four prior incidents suffices. *Mitchell v. Kirchmeier*, 28 F.4th 888, 901 (8th Cir. 2022); *see also Riis v. Shaver*, 458 F. Supp. 3d 1130, 1197 (D.S.D. 2020) ("three to ten" instances), *aff'd*, 4 F.4th 701 (8th Cir. 2021); *Moore v. City of Ferguson*, 213 F. Supp. 3d 1138, 1147 (E.D. Mo. 2016) ("five instances of excessive force"); *Holscher v. Mille Lacs Cnty.*, 924 F. Supp. 2d 1044, 1052 (D. Minn. 2013) ("seven attempted suicides and two suicides"); *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 510 (5th Cir. 2022) (testimony from three individuals about chemical spray use was sufficient).

Here, there were exponentially more incidents. Officers use chemical agents on detainees at least daily, R.Doc.345-34 at 3; App.1561, and more than 1,200 use-of-force reports concerning pepper spray were

produced in this litigation, R.Doc.345-14 at 2; App.1437. These reports, along with grievances and videos, paint a clear picture. Officers repeatedly used chemical agents in ways prohibited by official policy and the Constitution. *See supra* (at least 50 uses on restrained detainees, 25 on detainees who questioned officers, 250 on passively resisting detainees, 80 on detainees on suicide watch, and 60 uses of crowd control chemical agent on individuals). There are likely even more prior similar incidents because, according to a CJC official, "some corrections officers were not truthful when documenting the reasons for the use of pepper spray." R.Doc.345-33 at 6; App.1527.

In the face of this overwhelming evidence, the City makes several scattershot arguments. None have merit. First, the City argues that there cannot be a custom because the number of incidents is "small" compared to the number of detainees. OB55. But that's not how the analysis works. In *Ware*, this Court explained that the "number of mishandled complaints compared to the number of inmates" in the facility didn't undermine the existence of a widespread custom. 150 F.3d at 881-82 (finding custom based on "handful" of incidents); *see also, e.g.*, *Moore*, 213 F. Supp. 3d at 1147 (finding "five incidents" out of countless

arrests sufficient). The City's related argument that most of the prior incidents don't count because CJC did not find them "unjustified" also fails. *See* OB55. After all, the City's *own* evaluation of whether a use-of-force is justified cannot be the final word. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) (explaining it "is not enough that an investigative process" exists—what matters is "the adequacy of the investigation"). Here, the record is replete with instances where CJC deemed force "proper" when it violated its own policies. *See, e.g.*, R.Doc.344-20 at 3, 14; App.928, 939 (finding "proper" the use-of-force on person sitting "on his bed not moving"); R.Doc.346-6 at 78, 82; App.2070, 2074 (finding "necessary" the use-of-force on person lying "prone" in shower with hands "clasp[ed] over his face muttering to himself"); R.Doc.346-18 at 16, 24; App.3270, 3278 (finding "proper" the use-of-force on person declining to shower).

Second, the City asserts that plaintiffs are merely arguing that the "City does not abide by its own policies." OB53. Not so. While the City's custom does violate its own policies, it also violates the Constitution. *See supra* Section I.B.2.

Third, the City argues that the custom does not include "any incidents sufficiently similar." OB54. The City fails to explain exactly what is so dissimilar about the prior incidents; in any case, it's wrong. This Court has deemed prior incidents sufficiently similar to establish a custom even when they are not exactly the same. In *Mitchell*, for instance, this Court explained that the prior use of an "explosive munition" could help establish an excessive-force custom in a subsequent case about "lead-filled bean bags." 28 F.4th at 893, 901. And in *Parrish*, this Court determined that several prior incidents—ranging from child abuse to the rape of prisoner—were sufficiently alike because they all "constitute crimes of violence." *Parrish v. Luckie*, 963 F.2d 201, 205 (8th Cir. 1992); *see also Ware*, 150 F.3d at 877-79 (finding forced exposure, spying during intimate moments, and sexual assault all part of same pattern). Here, the prior incidents are far more similar than those in *Parrish*, *Mitchell,* and *Ware*. All four plaintiffs were restrained or passively resistant, Jerome and Darnell were sprayed with cans designed to control crowds, and Marrell and Jerome were sprayed for asking questions—the same circumstances in the incidents detailed above.

### 2. The City was deliberately indifferent to the widespread overuse of chemical agents.

The City had notice that officers routinely used excessive chemical agents and failed "to take any remedial action"—this is textbook deliberate indifference. *Harris v. City of Pagedale*, 821 F.2d 499, 506 (8th Cir. 1987). Indeed, the City does not even contest this in its opening brief, *see* OB51-56, and any such argument it may make on reply is "waived," ! *Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004). In any case, the deliberate indifference element is satisfied.

For municipal liability, notice can be actual or constructive. *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004). Constructive notice exists where misconduct is so "widespread or flagrant" that the "governing body should have known" about it. *Thelma D. ex rel. Dolores A. v. Bd. of Educ.*, 934 F.2d 929, 933 (8th Cir. 1991). Here, CJC leadership—including the Commissioner—reviewed and signed off on every use-of-force report. R.Doc.343-7 at 4; App.585. Commissioner Glass tracked use-of-force reports to draft monthly reports. R.Doc.343-23 at 3, 5; App.780, 782. And Commissioner Clemons-Abdullah assembled regular "Monday morning quarterback" meetings to review use-of-force reports. R.Doc.343-21 at 6; App.770. The City also

tracks chemical agent use on a detailed spreadsheet. R.Doc.345-7; App.1154-419. Because the reports describe repeated use of chemical agents on passively resistant and restrained people, the misconduct was surely "flagrant" enough to establish notice. *Thelma*, 934 F.2d at 933; *see also Parrish*, 963 F.2d at 204 (finding use-of-force reports notified policymaker). The Commissioner also received actual notice in 2021— well before Plaintiff Marrell Withers was assaulted with chemical agents in 2022—from this very lawsuit. R.Doc.1; *see Melendez v. Sec'y, Fla. Dep't of Corr.,* No. 21-13455, 2022 WL 1124753, at *15 (11th Cir. Apr. 15, 2022) (finding knowledge where attorney "specifically informed" prison warden of abuses through letter).

Armed with both actual and constructive knowledge of the custom, CJC did not change course. Instead, it covered up the unconstitutional acts of its officers. This constitutes deliberate indifference.

First, the City is deliberately indifferent because it operates a use-of-force system where reports of assault are "ignored" or "covered up." *Parrish*, 963 F.2d at 205 (finding deliberate indifference from police department's "use-of-force reporting system" that "covered up" abuse). The City deems nearly every use-of-force "justified" where so many—on

their face—are unjustified. *See supra* Section II.B.1. As Expert Schriro explained, "competent review" would have shown that "most of the force" by CJC officers is "excessive." R.Doc.343-8 at 40; App.634; *compare, e.g.,* R.Doc.346-13 at 26; App.2649 (detainee sprayed for asking "why I got to move") *with* R.Doc.346-13 at 31; App.2654 (finding spray "appropriate"); R.Doc.346-5 at 63; App.1936 (detainee sprayed for requesting post-arrest phone call) *with* R.Doc.346-5 at 68; App.1941 (finding spray "appropriate"). When a review system like this is "nothing more than a facade to cover the violent behavioral patterns of . . . officers" the entity is deliberately indifferent. *Beck*, 89 F.3d at 973.

Second, the City's refusal "to address or correct the known problem" constitutes deliberate indifference. *Harris*, 821 F.2d at 505. There is no indication in the record that CJC modified its conduct. And years of reports show that officers continued to use the same type of excessive force. *See e.g.* R.Doc.346-17 at 23; App.3195 (sprayed for not removing arm from food slot on 12/12/2018); R.Doc.346-45 at 45; App.5052 (same, 4/14/2019); R.Doc.346-30 at 26; App.3944 (same, 2/11/2021); R.Doc.346-48 at 84; App.5440 (same, 4/28/2021). In fact, the City did not even modify its conduct after this lawsuit was filed in 2021. Marrell was subsequently

sprayed while in handcuffs—just as Derrick, Darnell, and Jerome had all been sprayed while restrained. The City's inaction indicates that misconduct is "acceptable" to leadership. *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). And such failure "to take any remedial action . . . amounts to deliberate indifference." *Harris*, 821 F.2d at 506.

Third, the City's "failure to discipline" shows "deliberate indifference." *Ware*, 150 F.3d at 883. For instance, of the seven incidents that CJC actually determined were excessive—itself a serious undercount—only one led to a request to discipline. R.Doc.343-8 at 40-43; App.634-37. That sole request was then "thrown out." R.Doc.343-7 at 12; App.593. When leadership does "not discipline" officers who engage in unconstitutional conduct, their deliberate indifference allows others to be "further victimized." *Ware*, 150 F.3d at 884. That is just what happened here.

Evidence of deliberate indifference and tacit authorization abounds; there is at least a material dispute of fact on this element.

### 3. *The excessive-force custom caused the violations of Plaintiffs' constitutional rights.*

Finally, a jury could find that the custom was the "moving force" behind Plaintiffs' injuries. *Ware*, 150 F.3d at 885. The City does not argue

otherwise and cannot do so now. *See* OB51-56; *Chay-Velasquez*, 367 F.3d at 756.

Causation is easily established where the harm that plaintiffs suffered "was similar" to the "many other" incidents in the record. *Harris*, 821 F.2d at 508 (explaining "failure to remedy a known pattern" of abuse "cause[s]" subsequent abuse); *see also Moore*, 41 F.4th at 511-12. Here, each incident involving Plaintiffs is "similar" to the others; they were all either passively declining to follow directives, restrained, or both. Darnell was sprayed for not immediately locking down, sprayed again in the aftermath of that incident (while handcuffed), and sprayed a third time for joking (in a locked booth). *See supra* pp.18-20. Jerome was sprayed (while in a locked booth) for asking why he was being moved to a new cell. *See supra* pp.15-16. Marrell was sprayed (while handcuffed) for asking officers to check his COVID status before moving him. *See supra* pp.13-14. And Derrick was sprayed for not wanting to cell with a feverish and sick cellmate, then sprayed again (while cuffed), and yet again (in a locked booth). *See supra* pp.20-21. These violations were the "inevitable result" of the City's deliberate indifference to CJC's unconstitutional custom. *Ware*, 150 F.3d at 885.

## C. The district court correctly denied summary judgment on the water shut-off *Monell* claim.

If this Court exercises jurisdiction over the water shut-off *Monell* appeal, it should affirm the denial of summary judgment. Copious evidence establishes a "persistent pattern" of unconstitutionally depriving detainees of water, the City's deliberate indifference to that misconduct, and the resulting injury to Plaintiffs. *Ware*, 150 F.3d at 880.

### 1. There is an unconstitutional pattern of punitive water shut-offs.

There is no minimum number of incidents required to show a pattern, but fewer than ten incidents have routinely been deemed sufficient. *See supra* Section II.B.1. Here, at least 38 people experienced water deprivations while detained at CJC. R.Doc.343-8 at 20; App.614. The water shut-offs happen "all the time." R.Doc.342-5 at 16; App.456; *see also* R.Doc.343-10 at 2; App.710 (explaining water was cut "so many times for no reason"). And officers admit to them. *See, e.g.*, R.Doc.344-13 at 4; App.885 (Defendant Borders acknowledging he turned off water "a couple of times").

Moreover, the shut-offs are decidedly punitive. Officers turn off the water "as punishment" to an entire unit when a few people misbehave for

things like "not locking down" or "kicking [a] door." R.Doc.343-8 at 21-22; App.615-16. Person after person has explained that it was "for punishment," "as punishment," and "to punish." *Id*. Officers would also turn off the water "after macing" detainees, leaving people to burn in their cells. *Id*.

The shut-offs also have devastating consequences: detainees cannot drink, bathe, brush their teeth, flush the toilet, or take life-saving medication. R.Doc.343-8 at 20; App.614; R.Doc.342-4 at 28; App.438. They remain in this state for "hours" to "days" to longer than "a week." R.Doc.343-8 at 20-22; App.614-16; R.Doc.345-19 at 2; App.1478; R.Doc.342-5 at 16; App.456. During that time they are offered only "baby cup[s]" of water during mealtimes. R.Doc.343-3 at 8; App.554; R.Doc.344-13 at 3-4; App.884-85. As Defendant Borders explained, officers exercise complete discretion and detainees must wait until officers decide to "turn the water back on" for anything more. R.Doc.344-13 at 4; App.885.

Finally, the custom of punitive water shut-offs is unconstitutional. Any confinement conditions "not reasonably related to a legitimate governmental purpose" are unconstitutional and detainees are entitled to "the minimal civilized measures of life's necessities." *Stearns v. Inmate*

*Servs. Corp.*, 957 F.3d 902, 906, 907 (8th Cir. 2020). This includes water. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 228 (3d Cir. 2015) (holding deprivation of "potable water for three days" is "prohibited inhumane deprivation"); *Spires v. Paul*, 581 F. App'x 786, 793 (11th Cir. 2014) (holding "deprivation of potable water for several days is a denial of a basic need" (cleaned up)).

The City's only argument is to assert—without analysis—that "Plaintiff provides no evidence that punitive water shut offs occurred, let alone that they were so widespread." OB53. That's wrong: the foregoing evidence creates at least a genuine dispute of fact.

> **2.** ***The City was deliberately indifferent to the pattern of punitive water shut-offs.***

There is substantial evidence to show the City's deliberate indifference. First, Commissioners Clemons-Abdullah and Glass both had actual notice of the water shut-offs. R.Doc.343-22 at 7; App.777; R.Doc.343-23 at 6; App.783. Commissioner Glass was expressly informed of the shut-offs by the Public Defender's Officer. R.Doc.343-23 at 4, 6; App.781, 783; *see Melendez,* 2022 WL 1124753, at *15 (finding knowledge where attorney "specifically informed" prison warden of abuses through letter). And Commissioner Clemons-Abdullah explained that the shut-

offs were "brought up in briefings." R.Doc.343-22 at 7; App.777. Moreover, detainees submitted numerous grievances regarding water shut-offs. *See, e.g.*, R.Doc.342-4 at 29; App.439; R.Doc.343-10 at 2; App.710; R.Doc.342-1 at 15; App.364. Such complaints and grievances further establish notice. *Parrish*, 963 F.2d at 205 (relying on "written complaints").

Despite this knowledge, they did nothing. Commissioner Glass admitted that he never personally investigated the issue despite being informed of it. R.Doc.343-23 at 4, 6; App.781, 783. And neither Commissioner implemented policies governing who can turn the water off, documentation requirements, or access to potable water during a water shutoff. R.Doc.343-22 at 6; App.776; R.Doc.342-2 at 10; App.393; R.Doc.343-8 at 17; App.611. The City's refusal "to address or correct the known problem" constitutes deliberate indifference. *Harris,* 821 F.2d at 505; *see also Grandstaff*, 767 F.2d at 171 (inaction indicates that misconduct is "acceptable" to officers).

### 3. The water shut-off custom caused the deprivation of Plaintiffs' constitutional rights.

Finally, a jury could find that the custom was the "moving force" behind Plaintiffs' injuries. *Ware*, 150 F.3d at 885. The City has waived any contrary argument. *See* OB51-56; *Chay-Velasquez*, 367 F.3d at 756.

Causation is easily established here because the harm that Plaintiffs suffered "was similar" to the "many other" incidents in the record. *Harris*, 821 F.2d at 508. After all, the "inevitable result" of leadership's failure to address officer misconduct is the continuation of that very same misconduct in the Plaintiffs' cases. *See Ware*, 150 F.3d at 885. Here, by failing to investigate or regulate the punitive water shut-offs, the City allowed this custom to continue unchecked until it harmed plaintiffs. It was thus the "moving force" behind Plaintiffs' injuries. *Ware*, 150 F.3d at 885.

## III. The City's ADA appeal fails.

### A. This Court lacks jurisdiction over the ADA appeal.

As set out above, pendent appellate jurisdiction applies only if the pendent claim is "inextricably intertwined" with the appealable claim. *Shannon*, 616 F.3d at 865 n.8, 866; *see supra* Section II.A. There is no overlap between the qualified immunity inquiry, which asks whether the

officers violated a clearly established constitutional right, and the ADA inquiry, which asks whether CJC failed to accommodate disabilities in its uses of force. *Langford v. Norris*, 614 F.3d 445, 452, 458-59 (8th Cir. 2010) (dismissing ADA appeal because "no evident basis" for finding it inextricably intertwined with qualified immunity).

## B. The district court properly denied summary judgment on the ADA claim.

If this Court exercises pendent jurisdiction over the ADA appeal, it should affirm. By inflicting chemical agents on Darnell and Marrell without regard for Marrell's asthma or Darnell's epilepsy, CJC failed to accommodate them under the ADA. Under the ADA, each Plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Baribeau v. City of Minneapolis,* 596 F.3d 465, 484 (8th Cir. 2010); *see also* 42 U.S.C. § 12132. The evidence creates a material dispute of fact on all three elements.

First, the City does not dispute that Darnell and Marrell have qualifying disabilities—the words "epilepsy" and "asthma" do not even

appear in its argument, *see* OB47-51—and any such argument it may make on reply is waived. *Chay-Velasquez*, 367 F.3d at 756. In any event, epilepsy and asthma are disabilities because they "substantially limit[] one or more major life activities." 42 U.S.C. § 12102(1)(A). And CJC was aware of their disabilities. Darnell alerted officers about his epilepsy and need for seizure medication upon arriving at the jail. R.Doc.337-1 at 262; Sealed.App.262. Similarly, Marrell told officers about his asthma before they pepper sprayed him. R.Doc.342-6 at 12; App.469.

As for the second element, force is a covered service or program that must be administered in accordance with the ADA. Contrary to the City's assertion, *see* OB50, this Court has "broadly construed" the "services, programs, or activities" language in the ADA to encompass "anything a public entity does," *Bahl v. Cnty. of Ramsey,* 695 F.3d 778, 787 (8th Cir. 2012) (cleaned up). Accordingly, being "handled" in "a safe and appropriate manner" is covered. *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (noting Department of Justice "made clear" that ADA applies to "arrests or abuse").

The use of force, specifically, is also covered conduct. *See, e.g.*, *Wilson v. City of Southlake,* 936 F.3d 326, 331 (5th Cir. 2019) (applying

ADA to officer who berated and handcuffed disabled student); *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 824 (N.D. Cal. 2020) ("[F]ailure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force."), *aff'd*, 58 F.4th 1283 (9th Cir. 2023); *Est. of Richards v. Remington*, No. CV-22-00429-TUC-JGZ, 2023 WL 2503724, at *4 (D. Ariz. Mar. 14, 2023) (applying ADA to "use of force" against person in wheelchair during arrest). There is simply "no basis to categorically exclude uses of force in the prison context from the scope of the ADA." *Partridge v. Smith*, No. 17-CV-02941-CMA-STV, 2020 WL 897653, at *9 (D. Colo. Feb. 25, 2020).

Finally, as to the third element, this Court has recognized that public entities have an "affirmative duty" to reasonably accommodate individuals with disabilities. *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004); *see also Withers v. Johnson,* 763 F.3d 998, 1003 (8th Cir. 2014) (ADA applies to "failure to provide reasonable accommodations"). Plaintiffs do not claim they were pepper sprayed *because* of their disabilities, but rather that CJC sprayed them without reasonably accommodating—or even considering—their disabilities. *See Partridge*, 2020 WL 897653, at *11 (finding plausible that defendants "failed to

reasonably accommodate" plaintiff by "using an unreasonable amount of force"); *Padilla v. Beard*, No. 2:14-CV-1118 KJM-CKD, 2017 WL 1253874, at *32 (E.D. Cal. Jan. 27, 2017) (denying summary judgment for inadequate training on extracting people in mental health crisis).

In light of the foregoing, the City relies on an argument it makes for the first time on appeal: that compensatory damages are unavailable because the City was not deliberately indifferent. *See* OB49-50. This argument is waived. *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1022 (8th Cir. 2019).[12] Even if not waived, the City is wrong.

The deliberate indifference test under the ADA "does not require a showing of personal ill will or animosity," but can be "inferred" from a defendant's indifference to "the strong likelihood that pursuit of its questioned policies will likely result in a violation" of rights. *Meagley v. City of Little Rock,* 639 F.3d 384, 389 (8th Cir. 2011) (cleaned up). A

---

[12] The City's also makes a second brand-new argument on appeal: that vicarious liability does not exist under the ADA. *See* OB47-49. Neither the Supreme Court nor the Eighth Circuit have decided this question. *See City & Cnty. of San Francisco v. Sheehan,* 575 U.S. 600, 610 (2015) (declining to decide issue); *see also A.K.B. ex rel. Silva v. Indep. Sch. Dist. 194*, No. 19-CV-2421, 2020 WL 1470971, at *9 (D. Minn. Mar. 26, 2020) (noting issue undecided in Eighth Circuit). This Court should not address this open legal question where defendants have raised it for the first time on appeal.

"known" or "obvious" disability "triggers the duty to reasonably accommodate." *Hall v. Higgins,* 77 F.4th 1171, 1182 (8th Cir. 2023) (cleaned up). Here, both plaintiffs told officers about their disabilities: Marrell told officers he had asthma in the moments before he was pepper sprayed and Darnell told officers about his epilepsy upon arriving at CJC. That is more than sufficient to alert CJC to their disabilities and the need to accommodate. *Hall*, 77 F.4th at 1182 (finding notice where plaintiff "informed the Jail's guards and nurses"). The City's subsequent failure to accommodate their disabilities establishes deliberate indifference.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision.

Date: November 8, 2024          Respectfully Submitted,

                                *s/Shubra Ohri*

Maureen Hanlon                  Shubra Ohri
ARCHCITY DEFENDERS              Amy Briehan
440 N. 4th Street, Suite 390    RODERICK & SOLANGE
St. Louis, MO 63102                 MACARTHUR JUSTICE CENTER
314-814-9455                    906 Olive Street, Suite 420
mhanlon@archcitydefenders.org   St. Louis, Missouri 63101
                                314-254-8540
                                shubra.ohri@macarthurjustice.org

Lauren E. Bartlett
St. Louis University Legal
Clinics
100 N. Tucker Blvd., Suite 704
St. Louis, Missouri 63101
314-977-3306
lauren.bartlett@slu.edu

*Counsel for Plaintiffs-Appellees Derrick Jones, Jerome Jones, Darnell Rusan, and Marrell Withers*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the court's October 30, 2024, order granting Plaintiffs-Appellees' motion to file a brief not to exceed 15,000 words because it contains 15,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Pursuant to Circuit Rule 28A(h)(2), this brief has been scanned for viruses and are virus-free.

*s/Shubra Ohri*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Shubra Ohri*